18649

Les H. WAGNER, Appellant-Respondent, v. William C. EZELL, President, and Ned P. Hobbs, Luther B. Elmgren, Henry V. Sawyer and C. C. Johnson, Members of the South Carolina Board of Examiners in Optometry, Respondents-Appellants.

(154 S. E. (2d) 731)

*Messrs. Gibbs & Gibbs,* of Charleston, and *Haynsworth, Perry, Bryant, Marion & Johnstone,* of Greenville, *for Appellant, Les H. Wagner,*

*Messrs. Gibbs & Gibbs,* of Charleston and *Haynsworth, Perry, Bryant, Marion & Johnstone,* of Greenville, *for Respondent, Les H. Wagner,*

*Messrs. Lyles & Lyles,* of Spartanburg, *for Respondents-Appellants* (Appellant' Brief)

*Messrs. Lyles & Lyles,* of Spartanburg, *for Respondents-Appellants* (Respondents' Brief)

May 10, 1967.

LITTLEJOHN, Justice.

The Court is called upon to determine whether the South Carolina Board of Examiners of Optometry properly suspended the license of Les H. Wagner, an optician, to practice in this state.

The Board was created by the Legislature, as indicated by Chapter 18 of Title 56 of the Code, with general supervisory power over opticians.

Wagner has been duly licensed as an optician since 1964 and operates his office in a section rented from and located within the G-E-X Store in Charleston. Lordhill Corporation is a leasing agency renting space within the G-E-X Store.

The G-E-X Store is, in effect, a shopping center under one roof. There is one main entrance, through which customers enter only if they have procured a two-dollar membership card. Within the Store there are many leases; to a grocery store, a drugstore, an optician office, etc., and each tenant operates his own business under a lease from Lordhill.

Wagner is a licensed optician and his qualifications are not questioned in this action. His system of doing business is alleged by the Board to be in violation of the standards and requirements set out in the statutory law, and Rule C adopted by the Board.

In order to understand the questions presented to the Court, it is necessary to set forth in brief outline the system of operation of Wagner's business, the lease contract, and the plan of operation by the G-E-X Store itself.

This Store advertises as a discount house to serve Government employees and its over-all advertising plan emphasizes this characteristic as a drawing card. Each tenant has available catalogue advertising, and most tenants' customers have the use of centralized financing through a G-E-X Credit Department. Periodically, catalogue or pamphlet pub-

lications are mailed to those persons who have bought cards and who are referred to as "members".

Relevant portions of the lease under which Wagner operates require: (1) that Wagner charge prices determined by Lordhill; (2) that Wagner deposit the gross income from his business with Lordhill, which deducts 20 per cent as rent for the optician office and equipment; (3) that Wagner agree not to operate at another location within three miles for three years after termination of lease; (4) that the lease may be terminated by Lordhill on 25 days' notice or by Wagner on 30 days' notice; (5) that Lordhill may keep all prescriptions and patients' records after termination of the lease upon payment of one hundred dollars to Wagner.

As a part of the over-all picture, it should be added that no control is apparently attempted over the truly technical services of Wagner. All of the furniture and equipment (except small personalized tool-like pieces of equipment) are owned by Lordhill. Persons procuring optical services and supplies from Wagner may finance the same through the G-E-X Credit Department, whereupon the credit paper is transferred from Wagner to the Credit Department.

The appellant bought and paid eighty dollars per issue for advertising space in the G-E-X catalogue. Two signs located within the Store but outside the optical office advertise the "Optical Department", without referring to the optician's name. The desire of Lordhill to procure the prescriptions of Wagner upon termination of the lease warrants the conclusion that Lordhill hopes to keep optical services available to its customers.

There is no contention in this case that an optician may not advertise. There is no prohibition against an optician's selling optical supplies and his services on credit or on terms.

The statute does prohibit offering or giving money or other thing of value to induce the sale of spectacles. Section 56-1074. The statute does prohibit advertising terms under

which spectacles may be bought as a basis for attracting business. Section 56-1075. The statute does prohibit an optician from permitting another person or a corporation to use his license. Section 56-1076.

Section 56-1053 charges the Board with the duty of carrying out the purposes and enforcing the provisions of the law as related to opticians. In August of 1965, four of its members visited the G-E-X Store and the office of Wagner. They talked with Wagner and with a representative of the Lordhill Corporation and generally looked over the entire operation.

Thereafter, a rule to show cause returnable to the Board was served on Wagner why his license should not be suspended or revoked on the grounds that he "violated the provisions of the South Carolina State Law governing the * * * work of Opticians, Chapter 18, Volume 11, Code of Laws of South Carolina for the Year 1962, Sections 56-1074, 56-1075, 56-1076 and 56-1077 and Rule C of the Rules and Regulations governing Opticians in the following particulars:

"(1) In that you have affiliated yourself with G-E-X Membership Store, Charleston, South Carolina, a Delaware Corporation, and advertised, or caused to be advertised, that discount prices for spectacles or eyeglasses and materials connected therewith will be given patrons holding a membership card which may be purchased for $2.00.

"(2) In that you have affiliated yourself with G-E-X Membership Store, Charleston, South Carolina, and advertised or caused to be advertised that spectacles and eyeglasses or materials connected therewith may be purchased on terms and/or credit with no money down.

"(3) In that you have affiliated yourself with G-E-X Membership Store, Charleston, South Carolina, and allowed or permitted your license to be used by G-E-X.

"(4) In that you have held out or caused to be held out to the public that you are a dispensing Optician in the

G-E-X Membership Store, Charleston, South Carolina, and the operator of the Optical Department of G-E-X.

"(5) In that you have permitted G-E-X to practice or conduct the business of an Optician and share in the profits thereof under the rights and privileges conferred upon you by the license you hold.

"(6) In that your conduct has been unprofessional in affiliating yourself with G-E-X Membership Store.

"(7) In that you are not the sole owner and operator of the dispensing establishment known as G-E-X Optical Department and such is not operated wholly under your name."

The Sections and Rule involved are as follows:

"Section 56-1074. *Giving premiums forbidden.*—It shall be unlawful for any person to offer or give eyeglasses, spectacles or lenses as a premium with newspapers, books, magazines or merchandise or in any other manner to induce trade or to give or offer to give any sum of money or other thing of value to any other person, the object of which is to induce the examination of the eye or the sale of spectacles, eyeglasses, lenses or any part used in connection therewith."

"Section 56-1075. *Unlawful advertisements.*—It shall be unlawful for any licensed optometrist, physician, surgeon, optician or other person to advertise by any means whatsoever any untruthful, impossible, improbable or misleading statement in connection with testing eyes or fitting or supplying spectacles or eyeglasses or to advertise the amount of charges for professional services for testing the eyes or fitting or supplying spectacles or eyeglasses or the terms or guarantee on which any such service or article may be procured."

"Section 56-1076. *Permitting use of license by unlicensed persons.*—It shall be unlawful for any such licensee to permit his license to be used by any unlicensed person and shall be a violation of the terms hereof for any unlicensed person to practice or attempt to practice or conduct his business under the rights and privileges conferred upon some other person duly licensed."

"Section 56-1077. *Grounds for revocation or suspension of certificate.*—Any person registered as provided for in this chapter may have his certificate of registration revoked or suspended by the Board for any of the following causes:

"(1) Conviction of a felony or misdemeanor involving moral turpitude, in which case the record of conviction or a certified copy thereof certified by the clerk of court and the judge in whose court the conviction is had shall be conclusive evidence thereof;

"(2) When the certificate of registration has been secured by fraud or deceit practiced upon the Board;

"(3) For unprofessional conduct or for gross ignorance or inefficiency in his profession; and

"(4) When the holder is suffering from a contagious or infectious disease.

" *'Unprofessional conduct'* shall mean employing what are known as 'cappers,' 'peddlers' or 'steerers,' employing directly or indirectly any suspended or unlicensed optician or optometrist to perform any work covered by this chapter, the advertising of an optical business, treatment or advice in untruthful, improbable or impossible statements or habitual intemperance or gross immorality.

"Any licensee who violates any of the provisions of Sections 56-1074, 56-1075 or 56-1076 shall, in the discretion of the Board, have his license suspended on such terms as the Board shall enforce. In no case shall the suspension for the first offense exceed six months."

"Rule C.: All licensed opticians in South Carolina, dealing directly with the public, shall operate under their own names (the names under which they are licensed as opticians), and shall be the sole owners and operators of their dispensing establishments. This rule shall not be construed to prevent a licensed optician from being employed by another licensed optician."

When the matter came to be heard, counsel for Wagner filed (1) objection to jurisdiction of the Board to hear the

matter, (2) moved to disqualify the Board, (3) moved to make the rule to show cause more definite and certain in several particulars as set out in detail, and (4) interposed a general denial.

At the time of the motion to disqualify members of the Board, counsel for both sides asked the Board several questions, amounting, in effect, to an informal *voir dire*. All indicated that a fair hearing could be given based on the evidence submitted.

All contentions were overruled by the Board, which proceeded to hear the evidence.

Later, the Board filed a unanimous order (signed by four members, one member having disqualified himself before the hearing in order to testify), finding Wagner guilty on all specifications as set out in the rule to show cause and suspending his license for a period of six months on each specification, the suspensions to run concurrently.

Wagner then filed a petition for a writ of certiorari with the Court of Common Pleas for Charleston County. The entire record and briefs were submitted to The Honorable Clarence E. Singletary, as Resident Judge, for review.

Judge Singletary filed an order sustaining the finding of the Board as relates to specifications 1, 2, and 4. He found that the petitioner's license was properly suspended, but reversed the finding of the Board as relates to specifications 3, 5, 6, and 7, holding that there was no evidentiary showing to substantiate the Board's finding on these four particulars.

From the order of Judge Singletary both Wagner and the Board have appealed to this Court.

Wagner's appeal sets forth 12 exceptions, but we think fewer questions are presented to the Court as follows:

Question 1: Should the members of the Board have disqualified themselves because they had acquired independent knowledge relative to the issues involved?

The Legislature has created the Board and imposed upon it the duty of carrying out the purposes and enforcing the provisions of all the statutes relating to the practice of opticians. This Board has both the duty and the power to license opticians, and may suspend licenses.

It will be seen from a reading of the chapter establishing this Board that it has general supervisory powers, including the authority to hold hearings and make adjudications within the limits specified by the statute. It is to be expected that members of the Board would receive complaints and they are justified in making some investigation before a licensed optician is formally accused and subjected to a hearing.

The allegation of bias and prejudice upon which Wagner relies in an effort to disqualify the Board is not supported by a factual showing. He relies upon his own assertion that Board members have investigated the matter and served as "investigators, accusers, prosecutors, judge, and jury."

The fact, standing alone, that a Board member, acting within the scope of his proper ministerial functions, participated in the origination of the charges against a licensee is not grounds for disqualification.

In an Annotation appearing in 97 A. L. R. (2d) 1210, 1214, entitled *Disqualification, for bias or interest, of member of occupation or profession sitting in license revocation proceeding*, it is said:

"Absent a showing of some other prejudice, bias, or interest, the fact that a member of the hearing tribunal sitting at the license revocation or suspension proceedings also belonged to the professional or occupational organization which initiated or prosecuted the charges against the licensee is not sufficient reason to disqualify the member."

And then continuing at Page 1215 of this same Annotation:

"There is authority from several jurisdictions that disqualification for bias or interest will not result where the

hearing body or its subordinates, acting within the scope of their proper ministerial functions, participated in the origination of charges against the licensee."

The information which came to the attentiton of the Board members resulting from their investigation is not greatly, if at all, different from the testimony of Wagner himself, and there is no real dispute as to the evidence or facts involved in this case. Disqualification was not required under these facts.

Question 2: Did the failure of the Board to promulgate rules and regulations for procedure to be applied at revocation or suspension hearings and to provide for appeals render the Optometry Act unconstitutional and invalidate the proceedings of the Board?

We do not think that the failure of the Board to establish rules and regulations to provide for procedure at the hearing invalidated the proceedings. There can be no valid contention in this case that Wagner was denied due process of law. He was given abundant notice of the hearing, was served with a copy of the issues involved, was confronted with the witnesses and given an opportunity to cross examine them, and was permitted to submit evidence to his own satisfaction. The testimony of Wagner himself is not substantially different from that presented by the Board, and counsel in argument to this Court concedes that there are only issues of law for this Court to determine.

It is the general rule that where no specific rules of procedure are set forth, the due process requirement is met before a quasi judicial board if a fair hearing on all of the issues is provided.

Failure of the statute to provide for an appeal does not deprive Wagner of adequate review. In the case of *Feldman v. South Carolina Tax Commission,* 203 S. C. 49, 26 S. E. (2d) 22, this Court said:

"The law provides no mode of procedure for appeal from

the order of the Tax Commission revoking the license of a retail liquor dealer. It is generally held, however, that the method of reviewing the action of a board or tribunal in revoking a liquor license is by a writ of certiorari, upon the theory that while such bodies do not exercise the 'judicial power of the state,' as that phrase is used in conferring judicial power upon the courts of the state, they do exercise a quasi judicial power in such matters."

Similar review is available to Wagner.

Question 3: Is a conviction by a court of competent jurisdiction a prerequisite to the Board's exercise of its discretion in ordering a suspension of a license?

By this question Wagner submits that the Board has no authority to act in suspending a license until and unless a criminal conviction is brought about in a court of competent jurisdiction. This question is answered adversely to the appellant in the case of *Ezell v. Ritholz,* 188 S. C. 39, 198 S. E. 419, wherein the Court specifically held as relates to these same sections of the Code that even though a wrong may be a criminal wrong, it may also be a civil wrong and may furnish basis for both criminal and civil redress. This case so adequately covers this point that it will not be necessary to elaborate on the same.

Question 4: Was the rule to show cause so indefinite and uncertain as to deny Wagner the opportunity to prepare his defense?

We think the particulars set forth in the rule to show cause adequately placed Wagner on notice as to the issues. The specifications were in keeping with good pleading practices; he obviously was not taken by surprise; he was aware beforehand of the facts brought out and his evidence was basically similar to that presented by the Board. We find no merit in this exception.

Question 5: Was there evidence to sustain a finding that Wagner advertised discounts and terms in violation of the statute?

The relevant portion of Section 56-1074 is as follows:

"It shall be unlawful for any person to offer * * * to give any sum of money or other thing of value to any person, the object of which is to induce the examination of the eye or the sale of spectacles, eyeglasses, lenses, or any part used in connection therewith."

The relevant portion of Section 56-1075 is as follows:

"It shall be unlawful for any licensed * * * optician * * * to advertise * * * the amount of charges for professional services for testing the eyes or fitting or supplying spectacles or eyeglasses or the terms or guarantee on which any such service or article may be procured."

A statute which prohibits advertising prices of lenses or complete glasses has been held to be a valid exercise of police power. The practice which the statute is intended to protect the public against is that of filling a prescription to meet the price rather than the needs of the patient, and such is in the interest of public health. It is the work of the optician to fill the prescription of another qualified to make a diagnosis of a need for spectacles, but the fact that an optician does not prescribe does not mean that his work is not similarly important, and unless the public is protected as relates to the work of the optician, the public is not fully protected. It is undisputed that Wagner bought and paid for advertising space in the G-E-X catalogue. The first advertisement purchased referred to the G-E-X Optical Department. The other advertisements were amended so as to advertise "Les H. Wagner" as the optician. He explains that the first advertisement was entered through error of an understanding of the law, and if this first advertisement was the only matter, certainly no suspension would be warranted. All of the advertisements in the catalogue, including Wagner's, must be read in connection with the general advertising included on the second page relating to credit, since the credit sections obviously apply to the various departments advertising in the catalogue. A part of this advertisement reads as follows: "With convenient G-E-X, you need no

money down, take months to pay. Use the revolving charge for every day needs and school supplies, the time payment plan for major furniture and appliance purchases."

Wagner himself testified that he used this credit system. If the credit provisions referred to above have been included directly in the Wagner advertisement itself, we think it would be conceded that there was a violation of the statute, but the fact that the credit advertisement and the optical advertisement appear several pages apart does not change the true over-all picture, and we therefore hold that both the Board and the lower court were justified in finding that Wagner did violate Section 56-1075 by unlawfully advertising.

We also conclude that the evidence as relates to the over-all plan of operation, and Wagner's participation, warranted the finding by the Board that Wagner offered a discount, which is "a thing of value" as contemplated by the statute, with the object of including the sale of spectacles, and that a finding of a violation of Section 56-1074 has support in the evidence.

Question 6: Is Rule C valid and enforceable?

The Legislature has authorized the Board to "prescribe rules, regulations and bylaws for its own proceedings and government and for the examination of applicants for the practice of optometry and as an optician." This is the limit of the authority given to the Board as relates to the making of rules. The Board may not assume legislative authority and we hold Rule C to be invalid. Contest of other rules is not before us.

In no event could the Board revoke a license because of a violation of a rule it promulgated. The Legislature has spelled out in Section 56-1077 the grounds for revocation or suspension, and the Board may not invade the legislative field by adding additional grounds. See 70 C. J. S., Physicians and Surgeons, § 17, p. 876:

"Acts or conduct declared by the legislature to constitute

grounds for revocation or suspension of a medical, dental, or similar license must be designated with sufficient certainty and definiteness and be such as to affect the health, morals, or safety of the community; boards may not be authorized to determine the grounds for revocation."

Having disposed of Wagner's appeal, we now proceed to the appeal of the Board. By proper exceptions, the Board submits that the circuit court was in error in failing to sustain the Board's finding that Wagner allowed another to use his license in violation of Section 56-1076 and/or Rule C. It is not necessary to consider Rule C further inasmuch as the same has been heretofore declared invalid. We agree with the circuit judge in his finding that there was no evidence to sustain the Board's finding that Wagner allowed another to use his license. So far as the record shows, the optician office was operated, and all of the work therein was performed, by Wagner himself or under his direct supervision. The statute was designed to prevent some other operator from performing the technical services which an optician is licensed to perform, and Judge Singletary was correct when he said in his order, "It appears that petitioner was the optician, not Lordhill or G-E-X."

Let the order of the circuit court be affirmed except as relates to the validity of Rule C.

The license suspension for six months maximum directed by the Board resulted from a finding that all seven particulars had been proved. In that the court has eliminated five particulars, the case should now be remanded to the Board for review of the penalty in the light of our ruling and it is so ordered.

Affirmed in part; reversed in part; and remanded.

Moss, C. J., and Lewis. J., concur.

Bussey and Brailsford, JJ., dissent.

Brailsford, Justice (dissenting).

I agree with the disposition which the opinion of Justice Littlejohn makes of questions 1, 2, 3, 4 and 6, but respect-

fully dissent from the conclusion that the evidence establishes a violation by appellant of Sections 56-1074 and 56-1075, Code of 1962. As I read the record, the catalogue, for which appellant is held responsible, contains general claims of savings, convenience and service in the sale of a great variety of items to eligible purchasers at the "lowest possible prices." To sell all who are eligible at the same low price is not to give a discount; certainly it is not to give a thing of value to induce the sale of spectacles within the meaning of the statute. The case would be no stronger if the advertisement should be construed as an offer to sell at discount prices, whatever that term may imply. To sell and to give are readily distinguishable terms, and to offer to sell at a discount is not an offer to give a thing of value as proscribed by the statute.

As to the other aspect of this question, the farthest reach of the advertisement attributed to appellant is an offer to sell spectacles on credit, to persons with approved credit ratings, with no cash down and the price payable in monthly installments. The statute does not prohibit advertising spectacles for sale on credit. It only prohibits advertising the terms on which credit will be extended, apparently to avoid competitive claims concerning such terms. When this penal statute is construed strictly, as it must be, the advertisement here, which does not specify terms but rather describes the type and extent of credit available, is not proscribed.

For the reasons stated, I would reverse the order appealed from.

BUSSEY, J., concurs.