TED SHARPENTER, INC., Plaintiff-Appellee, v. THE ILLINOIS LIQUOR CONTROL COMMISSION *et al.*, Defendants-Appellants.

Second District   No. 2—85—0583

Opinion filed October 20, 1986.—Rehearing denied November 21, 1986.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart and William D. Frazier, Assistant Attorneys General, of Chicago, of counsel), for appellant Illinois Liquor Control Commission.

George W. Keeley, of Halfpenny, Hahn & Roche, of Chicago, for other appellants.

James J. Long and David S. Acker, both of Winston & Strawn, of Chicago, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:
The defendants, the Illinois Liquor Control Commission and the named individual defendants, appeal from an order of the circuit court of Kane County, entered in an administrative review proceeding, that

reversed the Commission's determination that the plaintiff's, Ted Sharpenter, Inc.'s, policy of offering different promotional discounts to on- and off-premises beer retailers constituted a violation of sections 6—5 and 6—17 of the Liquor Control Act of 1934 (the Act) (Ill. Rev. Stat. 1985, ch. 43, pars. 122, 133). The defendants argue the trial court's order must be reversed because it erred in finding as a matter of law that the Commission exceeded its authority when it ordered plaintiff to cease and desist its dual promotional-discount program.

Plaintiff, Ted Sharpenter, Inc., is the exclusive distributor of G. Heileman Brewing Company products within its designated geographic territory, which includes Kendall and parts of Kane, Du Page and DeKalb counties. Exclusive distributorships such as Sharpenter's are permitted by the Beer Industry Fair Dealing Act (Ill. Rev. Stat. 1983, ch. 43, par. 301 *et seq.*). Heileman products distributed by Sharpenter are Old Style, Old Style Light, Old Style L.A., Special Export, Tuborg, Drewry's, Black Label, Schmidt, Mickey's Malt, Colt 45, Malt Duck, and Kingsbury Near Beer. Retail licensees located within Sharpenter's registered territory who wish to sell Heileman products must purchase them from Sharpenter. They may not purchase Heileman products from another retailer (Ill. Rev. Stat. 1985, ch. 43, par. 115(d)), nor may a Heileman distributor who has been granted a sales territory sell or deliver to a retail liquor licensee whose place of business is not within that sales territory (Ill. Rev. Stat. 1985, ch. 43, par. 305(5)).

Sharpenter sells Heileman products to three types of retail operations: "off-premise" type accounts, including liquor-store chains and other package stores selling beer for off-premise consumption; "on-premise" type accounts, including bars and taverns; and "combo" stores that operate under the same roof both for on- and off-premise sales, such as a tavern with a liquor store attached. Individual defendants James McCue, Patrick Burke, and George Zobrest are owners or operators of licensed retail on-premise liquor establishments in Aurora. Convenience sales of beer to their customers for off-premise consumption account for about 5 to 10% of their businesses. Defendant Ronald Nichols has a "combo" operation in Aurora: 60% off-premise and 40% on-premise. Defendant Richard Ernzen currently has two off-premise establishments, one in Batavia and one in North Aurora, and formerly owned 50% of an on-premise establishment in Batavia. This three-way categorization of retailers is not reflective of any statutory classification formulated by the Illinois legislature. The State issues the same type of license to all retail licensees and does

not distinguish between on-premise versus off-premise retail operations in its issuance of licenses. The three categories of retail operations are used by Sharpenter in administering its dual-pricing practice. Under this practice, a lesser promotional discount is offered to retailers determined by Sharpenter to be "on-premise" operations than is offered to retailers determined by Sharpenter to be "off-premise" operations. Off-premise retailers are offered a $1.10-per-case discount if the retailer meets certain conditions, to wit: purchase of a certain minimum quantity of product and a promise to make a "good faith promotional effort" in relation to that product. A "good faith promotional effort" may include such practices as having an "every day low price," displaying an "in-store price card" indicating the cost of the item, or placing the product on a reduced-price sale.

On-premise operations are offered a lesser discount of $.50 per case on the same items that are offered to the off-premise establishments at a $1.10-per-case discount. The discount offered to on-premise operations is not conditioned on them making a "good faith promotional effort" in order to obtain the discount. Regardless of promotions, volume of sales is generally greater for off-premise stores than for on-premise stores. However, off-premise discount promotions generate 2 to 20 times the normal volume, whereas on-premise discount promotions show only the average volume of sales. In some instances, combo stores are offered these varying deals in proportion to the percentage of their business reflected by each type of operation. Generally, retail licensees whose off-premise sales amount to only 5 to 10% of the total business of the establishment are not offered the off-premise discounts.

On September 26, 1984, the Illinois Liquor Control Commission held a hearing to consider whether Sharpenter's discount policy violated the Liquor Control Act of 1934 (Ill. Rev. Stat. 1983, ch. 43, par. 93.9 *et seq.*). Robert Sharpenter testified regarding his corporation's discount system, noting that the goal of the promotional schemes directed at off-premise operations was to increase volume, whereas the object of the discount at on-premise places was to create good will, not to increase volume. The retail licensees also testified at the hearing. They testified that their on-premise operations had never been offered a discount under the same terms as off-premise licensees had been. Several retailers testified that they had attempted to get the favorable off-premise discount from Sharpenter but were refused. All the retail licensees purchase other brands of beer from various distributors, but none of those distributors maintains a dual-pricing policy which depends on the type of retail operation. The other distributors

charge all of their retail licensee customers the same price for their products. One of the retail licensees testified that one result of the exclusive sales territories enjoyed by distributors is that taverns down the street from his package store, which purchase their beer from an Elgin distributor, can sell Heileman products for less than he can in his package store because he is in Sharpenter's Aurora territory.

After considering the evidence introduced at the hearing and the briefs submitted, the Illinois Liquor Control Commission concluded on January 30, 1985, that the offering of different discount terms to different retailers constituted a violation of sections 6—5 and 6—17 of the Liquor Control Act of 1934 (Ill. Rev. Stat. 1985, ch. 43, pars. 122, 133). The Commission determined:

> "That a distributor is free to establish the price, terms of sale and discounts they offer to retail licensees so long as they conflict with no other law, however, once established they must be offered under the same terms and conditions to all retail licensees regardless of the nature of the operation, and may not discriminate.
>
> That to fail to do so, and offer the promotion under differing terms to different retailers as Sharpenter does constitutes a violation of sections 122 and 133 of the Illinois Liquor Control Act."

The Commission ordered that Sharpenter "cease and desist immediately in its preferential/discriminatory pricing policies" in conformity with the order.

Sharpenter filed a petition for rehearing, which was denied on March 13, 1985. It subsequently filed a complaint for administrative review on April 4, 1985, and Sharpenter also filed a motion for stay of the Commission's order, which motion was denied on April 23, 1985. Pleadings filed in opposition to the motion for stay alleged that Sharpenter had not yet ceased its dual-pricing practice.

On June 19, 1985, the circuit court of Kane County reversed the ruling of the Illinois Liquor Control Commission and remanded for any further proceedings which were not inconsistent with its opinion. In its order the court held that, while the Commission was "empowered to review the practice of its licensees," the Commission exceeded its authority in entering its order.

The Commission and the retail licensees preface their arguments with reference to section 1—2 of the Liquor Control Act (Ill. Rev. Stat. 1985, ch. 43, par. 94), which provides that the Act is to be liberally construed "to the end that the health, safety and welfare of the People of the State of Illinois shall be protected and temperance in

the consumption of alcoholic liquors shall be fostered and promoted by sound and careful control and regulation of the manufacture, sale and distribution of alcoholic liquors." The Commission then notes that in order for it to effectuate the provisions of the Act, it is empowered to adopt rules and regulations in accordance with the Act which it finds necessary to carry on its function and duties (Ill. Rev. Stat. 1985, ch. 43, par. 108(2)), and has jurisdiction to fine, and to suspend or revoke licenses for any violation of the Act (Ill. Rev. Stat. 1985, ch. 43, par. 108(1)). Thus, it concludes, it necessarily has the power to review the activity of a licensee to determine whether or not the licensee is in violation of the Act. Sharpenter does not contest the right of the Commission to investigate the activities of its licensees, but believes that power does not automatically confer upon the Commission the power to regulate those activities.

■ Defendants state that upon administrative review of a decision by the Commission finding a violation of the Act, the trial court is limited to a consideration of the record to determine whether the findings and order of the Commission are against the manifest weight of the evidence and whether the Commission acted arbitrarily and without cause or in clear abuse of its discretion. (*Spiros Lounge, Inc. v. Illinois Liquor Control Com.* (1981), 98 Ill. App. 3d 280; *Askew v. Daley* (1978), 62 Ill. App. 3d 370.) The duty of the appellate court on administrative review is the same as that of the circuit court. (*Board of Education v. Sickley* (1985), 133 Ill. App. 3d 921, 924.) Further, where the legislature empowers an administrative agency to perform certain acts, the courts are reluctant to interfere with the exercise of those powers or to substitute their discretion unless the agency action is palpably arbitrary, unreasonable, or capricious. *Richards v. Board of Education* (1960), 21 Ill. 2d 104, 110.

■ Although the findings and conclusions of the Commission on questions of fact are held on judicial review to be *prima facie* true and correct (Ill. Rev. Stat. 1985, ch. 110, par. 3—110; *Burke v. Board of Review* (1985), 132 Ill. App. 3d 1094, 1100), Sharpenter correctly points out that conclusions of law do not receive the same deference as factual conclusions in an appeal from an agency ruling. (*Leslie Car Wash v. Department of Revenue* (1976), 39 Ill. App. 3d 931, 934, *rev'd on other grounds* (1978), 69 Ill. 2d 488; *Caterpillar Tractor Co. v. Department of Revenue* (1963), 29 Ill. 2d 564, 566.) The scope of an agency's authority is a question of law, not of fact; the determination of the scope of an agency's power and authority is a judicial function, not one to be finally determined by the administrative agency. (*People ex rel. Thompson v. Property Tax Appeal Board* (1974), 22 Ill. App.

3d 316, 321, *cert. denied* (1975), 422 U.S. 1002, 45 L. Ed. 2d 666, 95 S. Ct. 2623.) On appeal from agency action, the agency's construction of a statute or rule is to be considered persuasive, but it is not binding on the court (*Gonzales-Blanco v. Clayton* (1982), 110 Ill. App. 3d 197, 206; *Howard v. Miller* (1982), 108 Ill. App. 3d 1, 5; *Olin Corp. v. Pollution Control Board* (1977), 54 Ill. App. 3d 480, 483), and the court will not be bound by an interpretation that is clearly erroneous, arbitrary, or unreasonable. *Environmental Protection Agency v. Pollution Control Board* (1980), 88 Ill. App. 3d 71, *rev'd on other grounds* (1981), 86 Ill. 2d 390.

■■ The position of the Commission and the retail licensees is that Sharpenter's dual-discount policy falls within the proscriptions set forth in sections 6—5 and 6—17 of the Act (Ill. Rev. Stat. 1985, ch. 43, pars. 122, 133). Section 6—5 provides in pertinent part:

"Except as provided below, it is unlawful for any manufacturer or distributor or importing distributor to give or lend money *or anything of value,* or otherwise loan or extend credit (except such merchandising credit) directly or indirectly to any retail licensee or to the manager, representative, agent, officer or director of such licensee." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 43, par. 122.)

Section 6—17 provides:

"No licensee licensed under the provisions of this Act shall deny or permit his agents and employees to deny any person the full and equal enjoyment of the accommodations, advantages, facilities and privileges of any premises in which alcoholic liquors are authorized to be sold subject only to the conditions and limitations established by law and applicable alike to all citizens." Ill. Rev. Stat. 1985, ch. 43, par. 133.

Section 6—5, along with section 6—4 of the Act (Ill. Rev. Stat. 1985, ch. 43, par. 121), was primarily designed to eliminate the evils of the so-called "tied house." "Historically, the problem of the 'tied house' was coupled more with the breweries than with the distilleries. [Citation.] The interest of a particular brewery in promoting its product in a given area went to the point of determining location, asserting control over the licensee, and, through the power of credit and the use of equipment, it was, in fact, in the practical retail sale of beer." (*Weisberg v. Taylor* (1951), 409 Ill. 384, 390.) The basic purpose of the tied-house statutes "is to keep liquor distilling separate from liquor distribution, thus preventing horizontal and vertical integration of the industry." (*Wine & Spirits Merchandisers, Inc. v. Illinois Liquor Control Com.* (1982), 104 Ill. App. 3d 377, 377-78.) In its opinion

finding section 6—5 constitutional, the court in *Weisberg v. Taylor* (1951), 409 Ill. 384, 392, noted: "[The act] likewise operates equally and impartially upon the distributors of beer and upon the retailers of beer."

The phrase "anything of value" has not been construed in this context in an Illinois case. Defendants contend that the higher per-case discount afforded off-premise retailers by Sharpenter, which is denied on-premise retailers even if they are willing to meet the conditions necessary to qualify for the discount, constitutes a thing "of value" as proscribed by section 6—5. The Commission acknowledged Sharpenter's argument that under this logic, any discount could be construed to be "a thing of value." It maintains, however, a discount cannot be considered a "benefit" or "a thing of value" if every other retailer purchasing from the sole distributor is being charged the same or a lower price. Affording all on-premise retailers a $.50-per-case discount keeps them on an even keel with each other, but places them at a decided disadvantage with off-premise retailers who are afforded a $1.10-per-case discount. Thus, the on-premise retailer either receives no benefit or is placed at a disadvantage, whereas the off-premise retailer obtains a significant advantage over the on-premise retailer who could not efficiently compete with off-premise promotions even if he so desired.

The Commission and the retail licensees find support in the construction of the phrase "other thing of value" in the case *National Distributing Co. v. United States Treasury Department, Bureau of Alcohol, Tobacco & Firearms* (D.C. 1980), 626 F.2d 997. In that case, National, an authorized supplier of Lancers wine, offered the wine at less than "laid-in-cost" (the cost incurred by a wholesaler or supplier to place the goods in inventory including such costs as manufacturer's invoice price, freight, and State and local taxes) to all retailers in the given area without discrimination, and with no conditions, restrictions, or quantity limitations. The Bureau of Alcohol, Tobacco & Firearms issued an order to National to show cause why its permit should not be suspended in that its below-cost sales of Lancers violated section 5(b) of the Federal Alcohol Administration Act (27 U.S.C. sec. 205(b) (1976)). That section, entitled "Tied house," is "designed to prevent producers, importers, and wholesalers from engaging in certain practices that might induce retailers to purchase products 'to the exclusion in whole or in part' of products from other producers, importers, and wholesalers in interstate commerce, where the 'direct effect' of the prohibited practice is 'to prevent, deter, hinder, or restrict other persons from selling or offering for sale any such products to

such retailer in interstate or foreign commerce.' " (*National Distributing Co. v. United States Treasury Department, Bureau of Alcohol, Tobacco & Firearms* (D.C. 1980), 626 F.2d 997, 1001.) One of the "certain practices" prohibited is inducement "by furnishing, giving, renting, lending, or selling to the retailer, any equipment, fixtures, signs, supplies, money, services, *or other thing of value*, subject to such exceptions as the Secretary of the Treasury shall by regulation prescribe, having due regard for public health, the quantity and value of articles involved, established trade customs not contrary to the public interest and the purposes of this subsection." (Emphasis added.) 27 U.S.C. sec. 205(b)(3)(1976).

The *National* court held:

> "The language cited by the Bureau, outlawing the 'giving \*\*\* [of] other thing of value,' 27 U.S.C. sec. 205(b)(3), when read in the context of the statute as a whole, does not prohibit below-cost pricing.
>
> Price cuts are prohibited by the Act only when they are coupled with an agreement or understanding that a retailer will buy other products of the wholesaler or producer to the exclusion of competitors, or when they lead to domination and control of a retail outlet by the wholesaler or producer. When a price cut on specific items, however deep, is offered throughout a sales territory without condition or quantity limitation, we do not see how it can be considered in violation of the Act." *National Distributing Co. v. United States Treasury Department, Bureau of Alcohol, Tobacco & Firearms* (D.C. 1980), 626 F.2d 997, 1020.

The Commission and the retail licensees construe *National* to mean, by inference, that unless price discounts are offered to all retailers in an area without discrimination a violation of the Federal tied-house provisions would occur. Similarly, by analogy, defendants posit the dual-discount practice in the case at bar constitutes a violation of section 6—5 of the Illinois Act. The Commission points out that in other contexts, a preferential discount has been held to be a "thing of value." (See *Aiea Lani Corp. v. Hawaii Escrow & Title, Inc.* (1982), 64 Hawaii 638, 647 P.2d 257 (finding that in a reimbursement scheme wherein a real estate developer would in effect obtain its construction-loan title insurance for 10% of the standard rate, the 90% discount constituted a "thing of value"); *Wagner v. Ezell* (1967), 249 S.C. 421, 154 S.E. 2d 731 (finding that a discount was a thing of value when offered to induce an eye examination or sale of eyeglasses).

The trial court below found, and Sharpenter argues here, that the

thrust of the *National* holding is that price cuts are prohibited only when they perpetuate the tied-house "evils" which section 6—5 was designed to protect against; specifically, when they are coupled with an agreement or understanding that the retailer will buy other products of the wholesaler or producer to the exclusion of competitors, or when they lead to domination and control of a retail outlet by a wholesaler or producer.

A significant distinguishing feature between the price cuts in *National* and Sharpenter's dual-discount practice here is that, in *National*, the price cuts were made not only to all retailers in the area without discrimination, but also "with no conditions, restrictions, or quantity limitations." (*National Distributing Co. v. United States Treasury Department, Bureau of Alcohol, Tobacco & Firearms* (D.C. 1980), 626 F.2d 997, 1000.) In contrast, as noted above, the discount offered to off-premise retailers here was subject to the retailer purchasing a minimum quantity of product and making "a good faith promotional effort" in relation to the product. The discount offered to on-premise establishments was not subject to these two conditions. Ted Sharpenter testified that the off-premise retailer may use various types of promotional techniques but, generally, will place the product on sale. He stated the retailer's effort is considered to be "a good faith" one "as long as he does something that would generate, in our opinion, more than his normal volume on that product that would justify the promotional discount." Ted Sharpenter also stated, "There have been a couple of times when I have told people that you don't get that promotional price any more unless there is some sort of promotional effort behind it." Although Sharpenter denied during his testimony that the on- and off-premise categories to which the separate discounts are applied were set up based on the volume of business of each category, his explanation of the reason for the classification shows the reason for the distinction between the two discounts is related to volume, but not in the sense that the larger-volume retailer pays less than the smaller-volume retailer. Sharpenter testified:

> "Well, the reason that we [set up the categories] is that we have found in our experience that when we offer a promotion discount to off-premise places and they participate to the extent of buying the minimum quantity and making a good-faith promotional effort that we get significant differences in volume, big advances in volume, as a result of those off-premise promotions. We do not get comparable advances in volume from the on-premise promotions that we run. That is why we set up the classification.

* * *

> [W]e have shown that when [an off-premise retailer] puts a certain item on sale he can significantly escalate the sale of that particular item which is what we are interested in doing.
>
> An on-premise customer has a different nature. It is basically a group of people coming in and calling for a certain brand; generally a really small portion of his sales are off-premise and pretty much a convenience to his customers. He has his products all priced on a standard basis and he doesn't promote his products and he keeps the prices the same no matter what prices he is paying for them so if you give the product to that person—generally if you wanted to get extreme and you gave the product away to an on-premise you might not increase your sales by one or two cases a week because he is going to keep his prices steady. He does not as a matter of practice promote the price.
>
> COMMISSIONER KOPPEL: In other words, all he gets is the discount without giving the volume?
>
> [TED SHARPENTER]: He gets the discount and we get our normal volume."

In reversing the Commission's order, the trial court wrote:

> "Careful analysis of the potential effect of a difference between distributor prices based upon the nature of the retail business reveals no 'evil' which section 122 was designed to protect against. It is clear that the difference in the discount prices in not a 'subterfuge' to disguise a grant of financial assistance in order to gain effective control over them."

One of the so-called "evils" denounced during the course of the legislative history of the Federal tied-house statute was the " 'forced increase in alcoholic beverage sales resulting from the "tied-house." ' " (*National Distributing Co. v. United States Treasury Department, Bureau of Alcohol, Tobacco & Firearms* (D.C. 1980), 626 F. 2d 997, 1009.) This so-called "forced increase" came about because the retailer was required by the brewer or distiller to take a certain quota of beer or spirits of some private brand as a condition to being allowed to retail that brand. " 'The temptation was often irresistible for the retailer to induce customers to buy drinks when they had already had quite enough.' " (626 F.2d 997, 1009.) Other tied-house social evils identified in the *National* case were the potential for political corruption, the proliferation of bars and saloons, and irresponsible ownership of retail outlets. 626 F.2d 997, 1010.

As noted by the defendants, one of the express end purposes of

the liberal construction of the Liquor Control Act of 1934 is so that "temperance in the consumption of alcoholic liquors shall be fostered and promoted by sound and careful control and regulation of the manufacture, sale and distribution of alcoholic liquors," which includes beer. (Ill. Rev. Stat. 1985, ch. 43, pars. 94, 95.05.) Also, one of the stated purposes of the Beer Industry Fair Dealing Act is "to promote the public's interest in fair, efficient and competitive distribution of malt beverage products by *** assuring the brewer and the public of service from wholesalers who will devote reasonable efforts and resources to sales and distribution of all the brewer's products, which wholesaler has been granted the right to sell and distribute and maintain satisfactory sales levels." Ill. Rev. Stat. 1985, ch. 43, par. 302(A)(ii).

Sharpenter is the exclusive distributor of Heileman products in the designated territory. There was testimony that one of Heileman's products, Old Style beer, is one of the top two best-selling beers in the area and that it has a high degree of consumer product loyalty. There was testimony from the retail licensees that Old Style is important to their businesses and that it would hurt their businesses to have to discontinue serving it. Retail licensees in Sharpenter's exclusive territory have no other source for Heileman products and, in particular, for the popular Old Style beer. In this respect, they are in fact "tied" to Sharpenter and must pay whatever price it asks if they wish to continue selling Old Style. We believe the offering of deep price discounts to off-premise retail licensees who further agree to buy a minimum quantity of product and to promote the product, while simultaneously denying such deep price discounts to on-premise retailers, is a price-cutting practice which is ripe for abuse and which affords Sharpenter control over the ability and extent to which certain on-premise retailers may decide to compete with off-premise retailers for the business of the off-premise consumers. We believe Sharpenter's discriminatory discount policy is antithetic to the purposes of the Liquor Control Act of 1934 (Ill. Rev. Stat. 1985, ch. 43, par. 93.9 *et seq.*) and the Beer Industry Fair Dealing Act (Ill. Rev. Stat. 1985, ch. 43, par. 301 *et seq.*) and amounts to giving off-premise retailers a thing "of value" as prohibited by section 6—5 of the Act.

One reason for reviewing an administrative action is to ensure that the agency has acted within the judicial bounds defined by law, and to guard those statutory and constitutional rights guaranteed to one subject to agency action. (*Pedigo v. Johnson* (1985), 130 Ill. App. 3d 392, 395.) The law is well established that an administrative agency has no inherent or common law powers, but is empowered to

act only according to authority properly conferred upon the agency by law (*Oak Liquors, Inc. v. Zagel* (1980), 90 Ill. App. 3d 379, 380; *Fahey v. Cook County Police Department Merit Board* (1974), 21 Ill. App. 3d 579, 582), or according to that which by fair implication and intendment is incident to the authority expressly conferred for the purpose of accomplishing the objectives of the agency (*Schalz v. McHenry County Sheriffs' Department Merit Com.* (1985), 135 Ill. App. 3d 657, 659). Thus, an express legislative grant of power or authority to an administrative body or officer includes the grant of power to do all that is reasonably necessary to execute that power or authority. (*Lyons v. Department of Revenue* (1983), 116 Ill. App. 3d 1072, 1077; *Parliament Insurance Co. v. Department of Revenue* (1977), 50 Ill. App. 3d 341, 347.) The acts of administrative agencies and officers should be upheld where such acts are within limits relevant to the purpose of the particular enabling legislation. *City of Chicago v. State & Municipal Teamsters* (1984), 127 Ill. App. 3d 328, 336; *Parliament Insurance Co. v. Department of Revenue* (1977), 50 Ill. App. 3d 341, 348.

Under the provisions of section 3—12 of the Act (Ill. Rev. Stat. 1985, ch. 43, par. 108), the Commission has the power to issue licenses and to suspend or revoke such licenses, or impose a fine in lieu thereof, upon notice after hearing that a licensee has violated any provision of the Act or any rule or regulation issued pursuant thereto and in effect for 30 days prior to such violation. It was emphasized at the hearing conducted by the agency in this case that this was not a proceeding on a citation to discipline a licensee, but was for the purpose of deciding the issue of " '[w]hether, under Illinois law, a distributor may structure different discount policies for retailer licensees based upon the nature of those retailers' operations, *i.e.*, primarily "on-premise" or "off-premise" type of operations.' " (In re Ted Sharpenter, Inc., Ill. Liq. Control Com., (Jan. 30 1985), No. 85 C 83.) The Commission decided that although a distributor is free to establish the price, terms of sale, and discounts which it will offer to retail licensees, it must make the same offer to all retail licensees regardless of the nature of the operation.

■ We believe the Commission's ruling falls within the limits relevant to the purpose of the tied-house statute in that it serves to minimize the degree of control any one distributor may directly or indirectly exert on the marketing decisions of retail licensees who wish to sell the products which the distributor alone is authorized to provide. We believe it was within the Commission's authority to enter the cease and desist order against Sharpenter and, moreover, that it was

appropriate for it to do so. A fine or suspension or revocation of Sharpenter's license would have been premature at the time of the hearing since the issue had not previously been decided by the Commission.

■ We agree, however, with the trial court's conclusion and Sharpenter's argument here that nothing in section 6—17 of the Act entitles retailers to the "equal enjoyment" of distributor prices, and that the dual-discount practice at issue was not unlawful by virtue of that section. (Ill. Rev. Stat. 1985, ch. 43, par. 133.) Section 6—17 provides for the right of all persons to free and equal enjoyment *of any premises* in which alcoholic liquors are sold. The court in *Dock Club, Inc. v. Illinois Liquor Control Com.* (1981), 101 Ill. App. 3d 673, expressly found that section 6—17 was not designed to facilitate regulation of prices.

For the reasons stated above, the judgment of the circuit court of Kane County is reversed.

Judgment reversed.

STROUSE and WOODWARD, JJ., concur.