CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Plaintiff-Appellee,
v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Defendants-Appellants.

Fourth District    No. 4—89—0982

Opinion filed July 19, 1990.—Modified on denial of rehearing
October 15, 1990.

Knuppel, Grosboll, Becker & Tice, of Petersburg, and Douglas Marti, of Greenville (Jerry Tice, of counsel), for appellant Southwestern Electric Cooperative, Inc.

Neil F. Hartigan, Attorney General, of Springfield (Clyde Kurlander and Edward P. O'Brien, Special Assistant Attorneys General, of Chicago, of counsel), for appellant Illinois Commerce Commission.

Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield (William S. Hanley, Stephen R. Kaufmann, and Alan R. Post, of counsel), for appellee.

Randall Rings, of Association of Illinois Electric Cooperatives, of Springfield, for *amicus curiae.*

JUSTICE STEIGMANN delivered the opinion of the court:

Defendants, the Illinois Commerce Commission (Commission) and Southwestern Electric Cooperative, Inc. (Southwestern), appeal the circuit court's reversal of a finding by the Commission that it had authority to resolve an action filed by Southwestern, alleging a violation of the Electric Supplier Act (Act) (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 401 *et seq.*) by Central Illinois Public Service Company (CIPS).

We reverse the circuit court and affirm and reinstate the Commission's order.

On February 6, 1968, Southwestern and CIPS entered into a service-area agreement which delineated the areas each electrical supplier was entitled to serve. Two oil leaseholds, T.C. Clow (Clow) and Buzzard Brothers (Buzzard), were located in the Louden oil field and within Southwestern's designated territory. On May 9, 1986, these leaseholds were assigned to the Exxon Corporation (Exxon).

On February 26, 1987, Exxon disconnected the electrical tie lines leading from the Clow and Buzzard leaseholds. These tie lines had been connected to Southwestern's distribution system. Exxon then connected tie lines from the Clow and Buzzard leases to its privately owned distribution system, which it was using to distribute electricity to various oil wells in the Loudon oil field. After that, Exxon "wheeled" electricity from a CIPS meter located within CIPS territory through Exxon's distribution system and, ultimately, to the Clow and Buzzard leases.

On February 13, 1987, Southwestern filed a complaint against CIPS and Exxon before the Commission alleging violations of the Act. Exxon was dismissed from the action after the Commission determined that it was not an "electric supplier" within the meaning of the Act (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 403.5) and, thus, not subject to the authority of the Commission. The Commission found in favor of Southwestern and determined that CIPS violated the service-area agreement by selling electricity to Exxon at a CIPS metering point, which was then transported by Exxon to locations within Southwestern's territory. As a result, the Commission ordered CIPS to discontinue furnishing electrical service to Exxon for its use at the Clow and Buzzard leases. *Southwestern Electric Coop., Inc. v. Central Illinois Public Service Co.* (June 1, 1989), ___ Ill. Commerce Comm'n Rep. ___ (ICC No. ESA 243).

After being denied a rehearing by the Commission, CIPS filed for administrative review of the Commission's decision in the circuit court of Sangamon County. On November 20, 1989, the circuit court

reversed the Commission's decision, based on its conclusion that the dispute in question was not within the authority conferred on the Commission by the Act.

Specifically, the circuit court found that the Act does not permit the Commission to regulate a customer's use of electricity. The circuit court held that the Act regulates electric suppliers only and that Exxon is a customer, not an electric supplier. The circuit court further determined that Southwestern was not entitled to serve the Clow and Buzzard leaseholds and that CIPS was lawfully providing electricity to these points from its metering point within CIPS territory. According to the circuit court, Exxon may deliver "its own electricity" wheeled from CIPS territory through Exxon's distribution system to the leases. In addition, the circuit court held that the Commission's order was unenforceable as it required Exxon, a nonsupplier of electricity, to either disconnect its tie lines to CIPS, or to permit Southwestern to trespass on its property in order to disconnect the lines.

■ Whether the Commission has the authority to resolve controversies between electric suppliers regarding a customer has not been resolved by the Illinois courts. The Commission determined that both CIPS and Southwestern were electric suppliers and that it had the authority to resolve their dispute. The scope of an agency's authority is a question of law, not of fact; the determination of the scope of an agency's power and authority is a judicial function, not one to be finally determined by the administrative agency. (*Ted Sharpenter, Inc. v. Illinois Liquor Control Comm'n* (1986), 148 Ill. App. 3d 936, 941, 499 N.E.2d 669, 673.) We review the Commission's decision pursuant to section 12 of the Act (Ill. Rev. Stat. 1989, ch. 111⅔, par. 412), and section 3—112 of the Administrative Review Law (Ill. Rev. Stat. 1989, ch. 110, par. 3—112).

The legislative declaration of the Act, section 2 thereof, states as follows:

> "The General Assembly declares it to be in the public interest that, in order to avoid duplication of facilities and to minimize disputes between electric suppliers which may result in inconvenience and diminished efficiency in electric service to the public, any 2 or more electric suppliers may contract, subject to the approval of the Illinois Commerce Commission, as to the respective areas in which each supplier is to provide service." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 402.)

This court has held that one of the purposes of the Act was "to put to rest the contest between competing utilities as to which would

supply what to whom and when." (*Western Illinois Electrical Coop. v. Illinois Commerce Comm'n* (1979), 67 Ill. App. 3d 603, 605, 385 N.E.2d 149, 151.) This court has also held that the Commission has the authority to determine the validity and to define the extent of service-area agreements between electric suppliers and to resolve a customer's request to be served by another electricity provider. (*Kruger v. Menard Electric Cooperative* (1988), 169 Ill. App. 3d 861, 864, 523 N.E.2d 708, 710.) The *Kruger* court stated the following in support of its holding:

> "The rationale behind giving primary jurisdiction to an administrative agency can be seen where that agency has been granted authority by the legislature over areas requiring the development of expertise and specialized knowledge. Having the agency with the technical expertise first review disputes rather than the courts promotes uniformity of decisions. [Citation.] Review is provided under the Act (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 412) through the Administrative Review Law (Ill. Rev. Stat. 1987, ch. 110, pars. 3—101 through 3—112). The Commission's expert and specialized knowledge in the area of electric supplier service-area agreements in contrast to the lack of such knowledge in the conventional experience of most circuit judges points out the correctness of the circuit judge's decision here. Plaintiff must first bring his claim to the Illinois Commerce Commission and not the circuit court." *Kruger*, 169 Ill. App. 3d at 864, 523 N.E.2d at 710.

■■ Based on the foregoing, we hold that the Commission's authority includes the resolution of disputes between electric suppliers arising from service-area agreements and regarding service to customers. In *Kruger*, this court held that the Commission has the authority to define the extent of a service-area agreement as to a customer. (*Kruger*, 169 Ill. App. 3d at 864, 523 N.E.2d at 710.) The Commission's specialized knowledge concerning electric supplier service-area agreements renders it the appropriate tribunal to decide the controversy presented in this case.

■■ Even though we have now held that the Commission has the authority to resolve disputes between electric suppliers, we still must determine whether the controversy is in fact between electric suppliers. On the one hand, this appears to be a case between an electric supplier, Southwestern, and its former customer, Exxon, as CIPS claims. Exxon, not CIPS, unilaterally constructed tie lines from its distribution system to CIPS territory and disconnected Southwestern's tie lines in the process. On the other hand, CIPS is providing

electrical service to the two oil leases with knowledge that they are located within Southwestern's territory. The 1968 service-area agreement refers to the service of consumers within the designated territories, and CIPS is now serving two consumers, the Clow and Buzzard oil wells, who are within Southwestern's territory—"customers" within the meaning of the Act (Ill. Rev. Stat. 1987, ch. 111⅔, par. 403.3). We hold that this dispute is properly characterized as one between electric suppliers and that the Commission had the authority under the Act to resolve it. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 411.) We reverse the circuit court's order finding to the contrary.

Next at issue is whether the Commission correctly interpreted the service-area agreement. The Commission first determined that the service-area agreement controlled the outcome of this controversy. Then, the Commission found that the Louden oil field, as well as the Clow and Buzzard leases, lies entirely within the exclusive service territory granted to Southwestern. In so finding, the Commission also considered the fact that Southwestern constructed Wright's Corner substation to serve the Louden oil field. This construction cost approximately $650,000. The Clow and Buzzard leases used about one-third of the substation's capacity prior to Exxon's termination of service. As a result of Exxon's rerouting, there is now a 50% excess capacity at Wright's Corner. After determining that CIPS's electric service to the oil leases was duplicative and inefficient, the Commission found that Southwestern was entitled to service the Clow and Buzzard leases.

The 1968 service-area agreement provides that Southwestern is to supply electrical service to consumers located within its designated territory. Because the Clow and Buzzard leases are located within Southwestern's territory, the Commission was correct in determining that only Southwestern should be permitted to service them. Except under very special circumstances (see *Coles-Moultrie Electric Cooperative v. Illinois Commerce Comm'n* (1985), 131 Ill. App. 3d 946, 476 N.E.2d 1303), the statutes do not provide that a customer has a right to elect the electric supplier of the customer's choice. Granting a customer that right would be inconsistent with the policy declarations of section 2 of the Act. Ill. Rev. Stat. 1987, ch. 111⅔, par. 402.

There are strong policy reasons favoring such a rule:

" '[A]n individual has no organic, economic or political right to service by a particular utility merely because he deems it advantageous to himself.' Larger policies are at stake than one customer's self-interest, and those policies must be enforced

and safeguarded by the PSC [Public Service Commission]." (*Lee County Electric Cooperative v. Marks* (Fla. 1987), 501 So. 2d 585, 587, quoting *Storey v. Mayo* (Fla. 1968), 217 So. 2d 304, 307-08.)

"[T]he policy behind the doctrine of regulated monopoly does not permit a customer to pick and choose between utilities. The doctrine of regulated monopoly is designed to protect the interests of the public as a whole, by preventing competition and inefficient duplication of services." (*Public Service Co. v. Public Utilities Comm'n* (Colo. 1988), 765 P.2d 1015, 1024.)

In a decision construing the Act, the court in *Fuchs v. Rural Electric Convenience Cooperative, Inc.* (C.D. Ill. 1987), 672 F. Supp. 1111, 1113, held as follows:

"One can hardly envision a statutory scheme which more clearly articulates and affirmatively expresses a state policy to displace competition. Electric utilities are generally acknowledged as a natural monopoly. [Citation.] What the Illinois legislature did in the Electric Supplier Act was to codify this notion."

■■ We find that the Commission correctly focused on the place that the electricity was being used and not the place where the wires were connected when interpreting the service-area agreement. "[O]ther jurisdictions have recognized that the place and purpose of the use of electric energy is controlling, rather than the place of connection." (*Southwestern Electric Power Co. v. Carroll Electric Cooperative Corp.* (Ark. 1977), 554 S.W.2d 308, 310.) That decision further stated the following:

"[T]he sound reasoning that the place of delivery of the electric current is not controlling, but rather the place and the purpose of its use must be the controlling factor is without question." (*Southwestern Electric Power*, 554 S.W.2d at 310.)

In a similar case, the Supreme Court of Colorado wrote the following:

"[T]o focus on the point at which electricity is delivered would invite inefficiency, subterfuge, and manipulation of the service area scheme in a manner injurious to the public good." *Public Service Co.*, 765 P.2d at 1020.

The decision by the Commission was in accordance with the public policy of Illinois as expressed by the Illinois General Assembly. The circuit court's decision was contrary to that policy. The effect of the circuit court's decision would be to allow well-financed consumers to construct their own electrical-distribution systems and to alter

their sources of service based on competitive bids. Those who would not be able to engage in such practices would ultimately be at the mercy of those who were able to do so. In addition, duplicate facilities, idle capacity, wasted economic resources, and higher electric rates would prevail, especially in rural areas.

■ CIPS argues that it is in the public interest to allow an electricity consumer to elect to be served by an electric supplier located beyond his service territory. Whatever merit there may be to this argument, we are the wrong forum to which it should be addressed. To the extent possible, the legislature, not the judiciary, should be deciding questions of public policy. We hold that the public policy behind the Act, its legislative declaration, and the cases interpreting it are clearly contrary to the argument of CIPS.

We note that Commissioner Manshio filed an opinion dissenting from the action taken by the Commission in this case. In that five-page dissenting opinion, Commissioner Manshio wrote the following:

"The majority reliance on the agreement would be correct if this were a geographic dispute. It is not. The issue is not location, but a customer's ability to choose his electric supplier. ***

* * *

*** If a consumer decides for whatever reason that he wants the services of someone beyond his service territory and is willing to pay to connect to that service, is it in the public interest to deny him the ability to do so? A majority of this Commission appears to believe so." *Southwestern Electric Coop., Inc. v. Central Illinois Public Service Co.* (June 1, 1989), ____ Ill. Commerce Comm'n Rep. ____ (ICC No. ESA 243, slip op. at 8, 9-11 (Commissioner Manshio, dissenting)).

We quote from this dissent because we strongly disagree with it. Consistent with the legislative declaration set forth in section 2 of the Act (Ill. Rev. Stat. 1987, ch. 111⅔, par. 402), we hold that consumers have been legislatively foreclosed from seeking electrical service from a supplier beyond their service territory. If this policy is to be reexamined, that reexamination will have to be undertaken by the General Assembly, not by this court, the circuit court, or the Commission.

CIPS further contends that the Commission was without authority to order Exxon, a nonsupplier of electricity and nonparty to the administrative proceeding, to act. The relevant portion of the Commission's order is as follows:

"IT IS FURTHER ORDERED that CIPS and Southwestern

cooperate in providing and/or removing facilities which currently allow Exxon to use CIPS furnished electricity upon the T.C. Clow and Buzzard Brothers leased premises, consistent with this Order and in a manner which will reasonably enable Exxon to have a continuity of service from the appropriate electric supplier designated under this Order." *Southwestern Electric Coop., Inc. v. Central Illinois Public Service Co.* (June 1, 1989), ____ Ill. Commerce Comm'n Rep. ____, ____ (ICC No. ESA 243, slip op. at 6).

The Commission has the power not only to approve service-area agreements, but to enforce such agreements if a dispute arises. Section 11 of the Act provides for this authority as follows:

"The Commission shall have the power and jurisdiction to, and shall, enforce compliance with this Act on complaint made by the electric supplier or customer or prospective customer aggrieved by any non-compliance with this Act and shall make such orders and take such action by appropriate court proceedings or otherwise which will secure compliance with this Act." Ill. Rev. Stat. 1987, ch. 111⅔, par. 411.

■■ Every decision by the Commission interpreting a service-area agreement necessarily affects customers of electricity. To withhold from the Commission the power to order a customer to merely permit a utility to enter upon the customer's property for the limited purpose of disconnecting tie lines would seriously undermine the Commission's authority. The Commission's order does not require Exxon either to act or to refrain from acting; instead, it merely requires Exxon to allow the utilities to connect their tie lines in accordance with the Commission's directives. The Commission must have this limited authority in order to "secure compliance" with its orders. Ill. Rev. Stat. 1987, ch. 111⅔, par. 411.

Reversed; Commission's order affirmed and reinstated.

GREEN and McCULLOUGH, JJ., concur.