[No. 61782-1. En Banc. February 29, 1996.]

TANNER ELECTRIC COOPERATIVE, *Respondent*, v.
PUGET SOUND POWER & LIGHT, *Appellant, and*
NINTENDO OF AMERICA, INC., ET AL., *Intervenors*.

658

*Perkins Coie,* by *Steven C. Marshall, Charles C. Gordon,* and *John R. Beck,* for appellant.

*Joel C. Merkel, John R. Ruhl,* and *Philip M. King,* for respondent.

*Windus, Thomas, Calmes & Wiley,* by *Joseph C. Calmes* and *David W. Wiley,* for intervenor Nintendo of America, Inc.

*Christine O. Gregoire, Attorney General,* and *Sally G. Johnston* and *Donald T. Trotter, Assistants,* for intervenor Utilities and Transportation Commission.

MADSEN, J. — At issue in this case is whether the trial court erred in granting summary judgment on the question of whether a service area agreement between a public utility and a rural electric cooperative was breached by a customer's transfer of power from the utility's service area for use in the cooperative's service area, and whether the utility's actions with regard to the cooperative violated Washington's Consumer Protection Act, RCW 19.86.

## FACTS

Tanner Electric Cooperative (Tanner) is a nonprofit rural electric cooperative which was formed in 1936 pursuant to the Rural Electrification Act. The basic purpose of the Act was to extend electric service to those rural areas of the country without central station service by providing

government loans at low interest rates. Charles F. Phillips, Jr., *The Regulation of Public Utilities* 560 (1984). When Tanner began its operations it had 32 customers on 13 miles of line. Tanner's headquarters are in North Bend, Washington. In addition to serving North Bend, Tanner serves the Ames Lake area and Anderson Island. Tanner's 1992 annual report stated that its business is "the transmission and distribution of electrical power to rural areas in King County and to Anderson Island at Pierce County." Videotape Recorded Proceedings at 665.

Tanner receives its electric power from Bonneville Power Administration (BPA) in accordance with a demand contract. This contract requires BPA to provide all of Tanner's power needs up to 25 megawatts. Puget Sound Power & Light Company (Puget) delivers BPA's power to Tanner pursuant to a 1966 general transfer agreement with BPA. Puget delivers the power to Tanner by "wheeling" it over Puget's transmission lines to a single breaker switch in Puget's North Bend substation (a point of delivery).[1] Videotape Recorded Proceedings at 305-06. The Puget/BPA contract places a 2.6 megawatt limit on the power wheeled to Tanner.

On July 29, 1966, Tanner and Puget entered into a territorial service area agreement (hereafter referred to as the 1966 agreement). The 1966 agreement sets forth the boundaries of the respective service areas and also provides as follows:

> 1. Puget agrees to wheel BPA power to Tanner for use in Tanner's North Bend and Ames Lake service areas pursuant to and within sixty (60) days of the execution of an agreement between Puget and BPA for the wheeling of BPA power to Tanner for a period of twenty (20) years.
>
> . . . .
>
> 4. Puget agrees that it shall not directly or indirectly dis-

---

[1]"Wheeling" refers to the transfer of electricity "by direct transmission or displacement, of electric power from one utility to another over the facilities of an intermediate utility." *City of Chanute v. Kansas Gas & Elec. Co.*, 754 F.2d 310, 312 n.1 (10th Cir. 1985).

tribute, wheel, transfer or sell electric energy within the limits of Tanner's service areas.

Ex. 2 at 2. Pursuant to RCW 54.48, which requires that agreements dividing service territories between public utilities and cooperatives be regulated by the Washington Utilities and Transportation Commission (WUTC or the Commission), the parties submitted the 1966 agreement to the WUTC for approval. Approval was granted in 1974, shortly after the enactment of RCW 54.48.

In April 1989, Tanner completed a 1990-91 work plan that projected that its load in the North Bend area would exceed its 2.6 megawatt demand limit at the North Bend substation during the 1990s. After reviewing this projection and consulting with Tanner, BPA decided to plan a new North Bend area substation with Puget. BPA also asked Puget to increase Tanner's North Bend wheeling demand limit to five megawatts. To date, Puget has not agreed to raise the contractual limit on power wheeled to Tanner.

In the spring of 1990, Nintendo of America, Inc. (Nintendo) purchased a 125-acre parcel of property in North Bend. Approximately 80 percent of the property that Nintendo purchased is within Tanner's service area, as set forth in the 1966 agreement, while the remaining 20 percent is within Puget's service area. Nintendo constructed a $50 million automated distribution facility on Tanner's side of the property. This facility is the only Nintendo distribution center in the United States. Once fully operational, the facility anticipated a daily production of some 70 trailer loads of Nintendo video games.

Elmer Sams, Tanner's manager, met with representatives of Nintendo several times in an effort to determine Nintendo's power needs and to solicit Nintendo's business. Nintendo's electrical contractor told Sams that Nintendo planned to build five buildings and a parking lot on the property over a six-year period. According to Sams, the contractor also projected that Nintendo's total electric load would be approximately 20 megawatts.

Sams recommended that Nintendo allow Tanner to install a primary service meter box along Northwest 8th Avenue, which borders part of the Nintendo site and divides the Tanner and Puget service areas. By making such an arrangement, the meter box could be tied into the underground cable that Tanner was planning to install at this location pursuant to its 1990-91 work plan. Further, Sams assured Nintendo officials that Tanner could serve the load to the first building from its existing distribution line on Northwest 8th Avenue. Sams gave Nintendo a proposed commercial rate schedule that was prepared solely for Nintendo. Tanner had never before served a primary meter customer, or a customer which itself distributes the power after it has been supplied to a meter on the customer's property.

After several conversations with Sams, Nintendo officials grew concerned about Tanner's ability to serve the Nintendo facility. Of specific concern was that (1) Tanner's service crew consisted of four people who were responsible for the three service areas, which in some instances are separated by distances as great as 60 miles or are accessible only by ferry; (2) Tanner had less than a dozen employees, including office staff; (3) Tanner used the least reliable "radial feed" distribution configuration; (4) Tanner employed an older form of cable, potentially subject to a degradation process known as "treeing"; and (5) Tanner had never served a customer comparable to Nintendo. Videotape Recorded Proceedings at 1571, 1574-76. Puget also told Nintendo that it would refuse to let Tanner tap Puget's Snoqualmie line near the Nintendo property, thus preventing Tanner from gaining a second point of delivery.

On July 19, 1990, Puget advised Tanner that it was terminating the 1966 agreement with the one-year notice required by that agreement. The termination date was September 27, 1991. Puget then suggested a possible purchase of Tanner, which Tanner rejected.

In September 1990, Puget told Tanner that it would be

serving Nintendo's facility pursuant to Nintendo's request. Tanner told Nintendo that such an arrangement would violate section 4 of the 1966 agreement, quoted above. Despite this information, Nintendo accepted Puget's service on January 17, 1991, eight months before the 1966 agreement expired. Puget delivered power to a meter in a structure built by Nintendo on Puget's side of the service area boundary, located along Northwest 8th Avenue. From there, Nintendo, using its own lines, transported the electricity across the Puget-Tanner border to the Nintendo facility in Tanner's service area.

Shortly before this service began, Tanner filed a petition for a declaratory order with the WUTC, seeking a ruling that Puget had no statutory duty to serve Nintendo and that Puget had violated the 1966 agreement. The Commission concluded that Puget did not have a statutory obligation to serve Nintendo, but that no Commission law prohibited such service. The Commission found that it did not have jurisdiction to enforce or interpret the 1966 agreement.

On April 19, 1991, Tanner filed a complaint for injunctive relief and damages against Puget in King County Superior Court. Tanner sought an immediate cessation of Puget's service to Nintendo as well as an order requiring Puget to furnish whatever power Tanner needed to serve Nintendo. The trial court denied Tanner's requests, whereupon Tanner filed an amended complaint bringing claims for breach of contract, tortious interference, common law unfair competition, and violation of the Consumer Protection Act. Tanner's bases for these claims included Puget's service to Nintendo as well as Puget's failure to increase Tanner's wheeling demand limit or to allow Tanner a new point of delivery from which to serve Nintendo; Puget's failure to upgrade the transformer at the North Bend substation; and Puget's refusal to negotiate in good faith with Tanner and the BPA to finalize and implement a plan of service by which both Tanner and Puget would provide adequate service to all customers. Nintendo and the WUTC were granted leave to intervene in the action.

Tanner then moved for partial summary judgment on its breach of contract claim. The trial court granted Tanner's motion and concluded as follows:

> While the Nintendo property straddles the boundary of the Puget/Tanner service areas and Puget delivers power to Nintendo at a point on the Nintendo property that is within [the] Puget service area, all of the Nintendo facility is located within the Tanner service areas. . . . The court has ruled that in construing this agreement, it is the point-of-use of power, not the point-of-delivery, that controls.

Clerk's Papers at 593. The trial court also held it undisputed that Tanner stood ready to deliver power to Nintendo in a sufficient quantity to meet Nintendo's needs. Puget's motion for reconsideration of the summary judgment ruling was denied.

The case was tried before a jury during February and March of 1993. During trial, the court dismissed Tanner's claim of unfair competition. At the close of trial, and pursuant to the summary judgment ruling, the jury was instructed that Puget had breached the 1966 agreement. On March 4, 1993, the jury returned a verdict for Tanner on its three remaining theories of liability and awarded $2.5 million in damages. In addition, the court awarded $410,000 in attorney's fees under the Consumer Protection Act and $8,816.04 in costs. The final judgment totalled $2,918,816.04. Puget appealed, and this court accepted the motion to transfer the appeal pursuant to RAP 4.3. Two issues control its resolution.

## I

The first issue presented to us is the propriety of a summary judgment determination on Tanner's breach of contract claim. To untangle the web which has been woven in this case it is necessary to review the procedural path over which this dispute has traveled as well as the regulatory framework which guides the resolution of service area disputes.

■ This case highlights the reasons for, and the importance of, the review process for administrative decisions. At issue here is not the alleged breach of a simple contract between two private parties, but the alleged breach of a service area agreement entered into by a public utility and a rural electric cooperative pursuant to statutory authority. Our review of the applicable statutes leads us to conclude that the WUTC has jurisdiction not only to approve or disapprove service area agreements but also to apply and interpret relevant statutes where a dispute arises pursuant to such an agreement and to issue appropriate orders. The following discussion shows why the WUTC's failure to fully exercise such authority rendered it necessary for this court to review the resulting issues.

When the disagreement initially arose between Tanner and Puget over service to Nintendo, Tanner appropriately sought intervention by the WUTC. In its petition to the WUTC filed in December of 1990, Tanner sought a ruling as to whether Puget had a statutory obligation to serve Nintendo upon request. Tanner also asked for an order declaring that Puget's service of Nintendo violated the 1966 agreement reached between Tanner and Puget and approved by the WUTC.

The 1966 agreement which Tanner sought to have interpreted by the WUTC sets forth the rights, responsibilities, and service boundaries of both Puget and Tanner. The 1966 service area agreement is authorized by RCW 54.48.030 which provides in part that

> [A]ny public utility and any cooperative is hereby authorized to enter into agreements with any one or more other public utility or one or more other cooperative for the designation of the boundaries of adjoining service areas which each such public utility or each such cooperative shall observe, for the . . . orderly extension of service in adjoining areas not currently served by any such public utility or any such cooperative . . . .

RCW 54.48 was adopted in 1969 to permit service area

agreements between public utilities and cooperatives. Without this statutory validation, service area agreements would be invalid as violative of antitrust laws. *See* 14 Samuel Williston, *Contracts* § 1653, at 358 (Walter Jaeger ed., 3d ed. 1972); *Fuchs v. Rural Elec. Convenience Coop., Inc.*, 858 F.2d 1210, 1212 (7th Cir. 1988), *cert. denied*, 490 U.S. 1020 (1989). RCW 54.48.020 sets forth the purpose of this legislation and of the agreements it promotes:

> The legislature hereby declares that the duplication of the electric lines and service of public utilities and cooperatives is uneconomical, may create unnecessary hazards to the public safety, discourages investment in permanent underground facilities, and is unattractive, and thus is contrary to the public interest and further declares that it is in the public interest for public utilities and cooperatives to enter into agreements for the purpose of avoiding or eliminating such duplication.

RCW 54.48.030 specifies that the WUTC shall have the authority to approve these agreements and provides that compliance with such agreements is required by law. In addition to this specific grant of authority over service area agreements, RCW 80.01.040 grants the WUTC broad authority to regulate the practices of *public* utilities.[2] (In return for their monopoly status, public utilities are regulated by the State through the WUTC. *See Jewell v. Washington Utils. & Transp. Comm'n*, 90 Wn.2d 775, 776, 585 P.2d 1167 (1978)). The Commission may "[m]ake such rules and regulations as may be necessary to carry out" its duties. RCW 80.01.040(4). The WUTC also may "make and issue interpretive and policy statements when necessary to terminate a controversy or to remove a substantial uncertainty as to *the application of statutes or rules of the commission.*" WAC 480-09-200(1) (emphasis added).

---

[2]RCW 54.48.040 makes it clear that while the Commission has authority over service area agreements between public utilities and cooperatives, cooperatives are not included in the definition of a public utility. Nor does the Commission have regulatory authority over cooperatives except with respect to service area agreements and agreements for the acquisition or disposal of duplicating utility facilities.

Whenever the commission shall find, after hearing, that any . . . practices, acts or services of any . . . electrical company . . . are unjust, unreasonable, improper, insufficient, inefficient or inadequate . . . the commission shall fix the reasonable rules, regulations . . . practices, acts or service to be thereafter furnished, imposed, observed and followed, and shall fix the same by order or rule.

RCW 80.28.040.[3]

If an approved service area agreement no longer satisfies the purposes of RCW 54.48, the Commission may initiate proceedings to determine whether approval of the agreement should be withdrawn and the agreement thus invalidated. *See* RCW 80.01.100. Such an action clearly involves the assessment of whether the agreement is in compliance with statutory policy.

In this case the WUTC issued its ruling on Tanner's petition in March of 1991. In that ruling it stated that Puget did not have a statutory obligation to serve Nintendo but that no Commission law prohibited such service. The WUTC also concluded that it had no jurisdiction to interpret or enforce the 1966 agreement or to determine the parties' rights thereunder. The WUTC denied Puget's subsequent request for "reconsideration/clarification." Neither party appealed this administrative ruling. *See Jewell*, 90 Wn.2d at 777 (judicial review of the WUTC's actions is pursuant to the Administrative Procedure Act, RCW 34.05). Nor did either party seek a writ of mandamus to compel the Commission to either interpret the 1966 agreement or rescind its approval thereof pursuant to RCW 54.48.020. *See* RCW 80.04.170 (complainant affected by commission order, deeming such order to be contrary to law, may apply for a writ of review); *see also State ex rel. Burlington N., Inc. v. Washington Utils. & Transp. Comm'n*, 93 Wn.2d 398, 410, 609 P.2d 1375 (1980)

---

[3]When more punitive measures are necessary, RCW 80.04.380 gives the WUTC authority to issue daily fines of $1,000 to public service companies found to have violated a Commission order, rule, direction, or requirement, and RCW 80.04.015 allows the WUTC to order a utility to cease and desist from providing service unless it is in compliance with the applicable regulations.

(mandamus is appropriate remedy where agency has clear duty to act or refrain from acting).

Tanner did, however, file a petition for injunctive relief in the King County Superior Court. When the superior court denied an injunction, Tanner filed the present action based on, among other claims, its allegation that Puget's service to Nintendo breached the service area agreement.

As noted earlier, the trial court granted summary judgment to Tanner on its breach of contract claim. To do so it ruled that the 1966 agreement between Tanner and Puget incorporated a point of use test for determining service disputes, and that Puget's service to Nintendo violated that test. The court ruled further that evidence of Tanner's ability to adequately serve Nintendo was not material to Tanner's right to serve under the 1966 agreement.

A party is entitled to summary judgment only when the trial court finds that there is no genuine issue as to any material fact, that reasonable persons could reach only one conclusion and that the moving party is entitled to judgment as a matter of law. *Higgins v. Stafford*, 123 Wn.2d 160, 169, 866 P.2d 31 (1994); *Scott Galvanizing, Inc. v. Northwest Enviroservices, Inc.*, 120 Wn.2d 573, 580, 844 P.2d 428 (1993). In resolving a motion for summary judgment, the court must consider all facts submitted and make all reasonable inferences from the facts in the light most favorable to the nonmoving party. *Scott*, 120 Wn.2d at 580; *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Furthermore, in reviewing a grant of summary judgment, the appellate court engages in the same inquiry as the trial court. *Scott*, 120 Wn.2d at 580; *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 811, 828 P.2d 549 (1992). Thus, in deciding this challenge to the trial court's order of summary judgment, we review the same record that was available to the trial court and make all reasonable inferences from the facts in favor of Puget. *See Scott*, 118 Wn.2d at 580.

The point of use test which the trial court applied is

one of three tests used in the industry to resolve service area disputes. The point of use test dictates that only the utility authorized to serve within a territory may provide power to a facility within that territory. *Public Serv. Co. v. Public Utils. Comm'n*, 765 P.2d 1015, 1019 (Colo. 1988). The point of service, or point of delivery, test focuses on the point at which electricity is delivered rather than on the point at which it is consumed. If a utility provides electricity to a customer within its territory, the sale is proper, even if the customer transports the power into the territory of another utility for the customer's use. *Public Serv. Co.*, 765 P.2d at 1019. The geographic load center test permits the utility which serves a majority of a customer's load to serve the entire load, regardless of the territorial boundaries of a service area. *Public Serv. Co.*, 765 P.2d at 1019.

Tanner argues that RCW 54.48 requires this court to read the point of use test into the 1966 agreement as a matter of law and thus uphold the trial court's finding of breach. Puget responds that the 1966 agreement preceded the adoption of RCW 54.48 and contends that only statutes in effect at the time a contract is made become a part of the agreement. *See Wagner v. Wagner*, 95 Wn.2d 94, 98, 621 P.2d 1279 (1980); *Dopps v. Alderman*, 12 Wn.2d 268, 273, 121 P.2d 388 (1942) (parties presumed to contract with reference to existing statutes).

■■ While Puget makes a valid point, it is also true that a contract that is contrary to the terms and policy of an express legislative enactment is illegal and unenforceable. *Vedder v. Spellman*, 78 Wn.2d 834, 837, 480 P.2d 207 (1971); *Waring v. Lobdell*, 63 Wn.2d 532, 533, 387 P.2d 979 (1964). Furthermore, it is impossible to interpret the 1966 agreement without considering the purpose and policies of RCW 54.48 since that legislation was promulgated to encourage and validate service area agreements as discussed earlier.

RCW 54.48 does not mention what test should be applied in a dispute over service to a straddling customer.

To conclude that the 1966 agreement incorporates a point of use test as a matter of law, therefore, it must be clear either that public policy requires such an interpretation or that the parties intended to incorporate the test into their agreement and the test is not contrary to law.

The WUTC and Tanner argue that the point of use test best serves the statute's policy. The trial court agreed with Tanner and the WUTC that public policy required it to construe the 1966 agreement to include a point of use test. The court began its analysis by referring to the Washington statutes governing service area agreements and policy arguments made by the WUTC based on those statutes. The court also considered cases from other jurisdictions that have upheld application of the point of use test by utility commissions in resolving service area disputes. Those cases involved disputes arising as a result of straddling utility customers, or customers with facilities that cross a service area boundary. The trial court here decided that the dispute between Puget and Tanner involved a straddling situation to which the point of use test should apply, and thus concluded solely on the basis of these policy arguments that Puget's service to Nintendo breached the 1966 agreement.[4]

Given the regulatory authority discussed earlier it is understandable that the trial court was influenced by the policy arguments made by Tanner and the WUTC as an intervening party. Unfortunately, while the trial court was persuaded by those policy arguments, the court did not directly address the March 1991 declaratory ruling issued by the WUTC.[5] In that ruling, the WUTC declined to interpret either the 1966 agreement or the law applicable to this service dispute. The WUTC first stated that it had no jurisdiction to interpret the 1966 agreement. Ex. 45 at

---

[4]The trial court found this was a straddling case and no one disputes this finding. Videotape Recorded Proceedings at 95.

[5]This may be due to the contradictions between the language of the ruling and the WUTC's position as intervenor, as well as to the fact that the ruling was not directly before the court as neither party had appealed the Commission's ruling.

7. After summarizing the parties' positions, the WUTC stated the following:

> A valid Service Area Agreement can limit Puget's statutory obligation to serve, assuming that Tanner is willing and able to provide the service. If the Service Area Agreement is found to be enforceable, Puget does not have a statutory obligation to serve Nintendo under the stipulated circumstances.
>
> The determination of whether Puget *may* serve Nintendo must be made by the courts in connection with interpretation of the Service Area Agreement. No Commission law prohibits such service.

Ex. 45 at 8. The WUTC did not refer to RCW 54.48 or the policies thereof, nor did it discuss whether a point of delivery, point of use or geographic load center test would have best effectuated public policy in the circumstances presented here.

In its role as intervenor before the superior court and this court, however, the WUTC has proved more than willing to discuss statutory policy. The WUTC urges this court to "adopt the reasoning of the Commission" in its 1991 ruling which they say expressly rejected the point of delivery test as inconsistent with statutory policies and, instead, interpreted the agreement as incorporating a point of use test. Br. of Intervenor WUTC at 19-20. Unfortunately, the WUTC attempts to rewrite history by insisting that its current position is consistent with its declaratory ruling. We can find no reference in the WUTC order to statutory policy, to the point of use test, or to any other test used to resolve a straddling situation. Also perplexing is the fact that by stating in its order that no Commission law prohibited Puget's service, the WUTC contradicted its current position that the point of use test applies to the 1966 agreement and proscribes Puget's service of Nintendo. The WUTC's present position is based not on the language of the 1966 agreement but on the public policy the Commission *now* finds in RCW 54.48.

While we recognize that this clearly is an area ripe

for deference to agency expertise, the contradictory positions taken by WUTC provide little assistance in resolving the present dispute. Moreover, for us to adopt the Commission's present argument that the statute requires application of a point of use test and apply it retroactively to condemn service that the WUTC refused to halt makes little sense. The Commission's current interpretation is not supported by its earlier ruling and appears to be nothing more than an isolated action that does not merit this court's deference. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 815, 828 P.2d 549 (1992) (no deference to agency because statutory interpretation applied was no more than an isolated action by the Department).

Tanner and the WUTC also maintain here, as before the trial court, that the better-reasoned cases from other jurisdictions apply the point of use test to straddling situations. Whether this observation is correct or not, it is interesting to note that most of the cases cited address an appeal of a utilities commission ruling that applied one of the three tests described earlier to a dispute between two electricity suppliers. Thus, unlike this case, which is cast solely as a breach of contract claim, those cases involved review of agency rulings.

For example, the Colorado Supreme Court reversed the district court and upheld the public utilities commission's application of the point of service test to a straddling situation in *Public Serv. Co. v. Public Utils. Comm'n*, 765 P.2d 1015 (Colo. 1988). The Colorado court stated that the PUC had made a policy decision concerning the point of service test, and that such a determination fell squarely within the expertise of the PUC. The court added that such a determination was an administrative matter "where there is broad latitude for sound discretion." *Public Serv. Co.*, 765 P.2d at 1020. *See also Central Ill. Pub. Serv. Co. v. Illinois Commerce Comm'n*, 202 Ill. App. 3d 567, 560 N.E.2d 363 (1990) (Illinois Commerce Commission had authority to resolve a straddling dispute arising under service area agreement and to apply point of use test to the dispute), *appeal denied*, 136 Ill. 2d 542 (1991).

While it is clear from those cases that the point of use test has much to be said for it, especially in comparison to the point of delivery test, it is by no means apparent from them that the point of use test should apply in every service dispute between two electrical energy providers. *See Public Serv. Co.*, 765 P.2d at 1022. Nor is it apparent that these holdings warrant application of the point of use test as a matter of law to service area disputes in Washington. In this state, service area agreements are not mandated by law, as they are in most of the cases cited by WUTC and Tanner.

Nor can we find that Puget's service to Nintendo in this case undermines the policies of RCW 54.48. There was conflicting evidence regarding the extent to which service to Nintendo by either Puget or Tanner required duplication of existing facilities. Moreover, Puget furnished power to Nintendo from a primary meter located along Northwest 8th Avenue, which is the same street by which Tanner planned to install a meter for serving Nintendo. Since Nintendo would take the power from either meter using its own equipment, duplication resulting from Puget's service appears unlikely. In addition, there was testimony that Tanner would have had to install an underground line to provide Nintendo with reliable service. Videotape Recorded Proceedings at 1829, 1851-52, 2224. Our review of the record places us in agreement with the trial judge who denied Tanner's request for an injunction:

> [T]he legislative purpose does not appear to be undermined by permitting a utility to provide delivery of power to a point within the utility's own service area for the transmission over the customer's own lines to the point of use where the customer straddles a service boundary. Duplication of lines and service would not be avoided by requiring Nintendo to receive power from Tanner. On the contrary, plans A through D as described by [Tanner] in [its] testimony would result in some duplication of lines and equipment.

Clerk's Papers at 246-47.

In sum, it does not appear that either statutory law or public policy require us to insert a point of use test into the Puget/Tanner agreement.

Because we conclude that a point of use test is not required by RCW 54.48, we turn to the question of whether the parties intended that test to apply to boundary questions under the 1966 agreement. The touchstone of contract interpretation is the parties' intent. *Scott*, 120 Wn.2d at 580. In Washington, the intent of the parties to a particular agreement may be discovered not only from the actual language of the agreement but also from " 'viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.' " *Scott*, 120 Wn.2d at 580-81 (quoting *Berg v. Hudesman*, 115 Wn.2d 657, 663, 667, 801 P.2d 222 (1990)). Contractual language also must be interpreted in light of existing statutes and rules of law. 3 Arthur L. Corbin, *Contracts* § 551, at 198 (1960). Interpretation of a contract provision is a question of law only when (1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one reasonable inference can be drawn from the extrinsic evidence. *Scott*, 120 Wn.2d at 582.

It is undisputed that the agreement contains no express reference to a point of use test or any other test. The 1966 agreement first sets out the boundaries of Tanner's service areas and then states as follows: "Puget agrees that it shall not directly or indirectly distribute, wheel, transfer or sell electric energy within the limits of Tanner's service area above described . . . ." Ex. 2 at 2. Tanner argues that this language clearly prohibits Puget from delivering power in its own territory if it is for use within Tanner's territory and reflects the parties' intent to apply a point of use test for straddling customers.

Although in its motion for reconsideration Puget offered extrinsic evidence that supported its contention that the

parties never intended to incorporate a point of use test into the 1966 agreement, the court found that the evidence had no bearing on that agreement.

> I am not persuaded that I should change my mind, were I to hear in great detail about these prior incidents where some agreement was reached between Tanner and Puget about how to treat areas that straddled. Fortunately, they were able to resolve their differences and reach agreement. I don't think that bears on how the Court must construe the agreement when there hasn't been an agreement.

Videotape Recorded Proceedings at 95.

This conclusion was erroneous. Although the court said there was no agreement at all regarding service to straddling customers, the court went on to draw a conclusion about what the parties intended in such a circumstance. By concluding that the parties intended a point of use test, and importing that test into the agreement, the court tacitly acknowledged ambiguity with respect to straddling customers. To resolve that ambiguity the trial court considered only some of the extrinsic evidence offered — specifically the statute. The trial court erroneously concluded that the circumstances surrounding the making of the contract and the subsequent acts and conduct of the parties were irrelevant to its interpretation of the 1966 agreement.[6]

Of particular significance is the declaration submitted by Puget stating that the word "indirectly" never was intended to establish a point of use test. Clerk's Papers at 636. "To the best of my knowledge, the parties never discussed which utility would serve a customer whose property straddled the boundary line." Clerk's Papers at 636. Indeed, a letter written by Puget to Tanner in 1967 acknowledged that the 1966 agreement did not address

---

[6]While the evidence designed to show the parties' intent was not submitted until Puget filed its motion for reconsideration, the trial court considered it before denying that motion. Thus, the documents are properly part of the this court's consideration. *See Scott Galvanizing, Inc. v. Northwest Enviroservices, Inc.*, 120 Wn.2d 573, 580, 844 P.2d 428 (1993).

the problem of straddling customers. In that letter to Tanner, Puget set forth the parties' understanding of the limitations of the 1966 agreement:

> This letter is to confirm our conversation and understanding of this morning. The service territory agreement between Tanner Electric and Puget Power does not specifically spell out which serving utility is entitled to serve a customer in the rather unusual event in which the prospective customer's property lies across the boundary line set forth in that agreement.

Ex. 3. The parties then decided that the utility with the most square footage of the customer's building within its service area would serve that customer, in effect applying a geographic load test to determine service. This letter was not incorporated into the 1966 agreement and there is no evidence that the parties operated as though the 1967 letter were part of the agreement. Separate agreements executed by the parties in 1987 and 1988 for provision of power to subdivisions straddling the Puget/Tanner boundary do not refer to the 1967 letter and make very different arrangements for service. Clerk's Papers at 247; Ex. 8, 9.

In the 1987 straddling situation, the parties agreed that Tanner would serve Division One of a housing development while Puget would service Division Two of the same development. Ex. 8. The parties did not look to the percentage of a particular building on either side of the line, as they had in 1967, but assigned all the houses and lots in one housing division to a single utility. Similarly, the parties agreed in 1988 that Puget would serve one entire plat and Tanner another, thus permitting each party to supply electricity for use in the other's service area. Ex. 9. On none of these occasions did Puget and Tanner purport to apply the 1966 agreement.

We conclude, based on the above discussion, that the trial court erred in applying a point of use test to the 1966 agreement as a matter of law. Because issues of material fact exist as to what, if anything, the agreement contem-

plates in a straddling situation, we must reverse the grant of summary judgment for Tanner on this issue. Even if the language "indirectly distribute, wheel, transfer or sell electric energy" is read to mean that any form of conveying energy to a location within Tanner's territory was prohibited, a straddling customer's property by definition does not lie wholly within Tanner's territory. Ex. 2 at 2. Therefore, the language relating to "indirectly" is ambiguous in these circumstances. The extrinsic evidence offered by Puget strongly indicates that the language does not resolve questions of service to a straddling customer. The court's obligation is to ascertain the intent of the parties, and intent is very much a question here.

The trial court also granted Tanner's motion for summary judgment on the basis that evidence of Tanner's inability to serve Nintendo was not material to Tanner's right to serve under the 1966 agreement. The section of the 1966 agreement at issue provides as follows:

> [I]n the event Tanner shall fail, refuse or be unable to serve any person within any of its said service areas and such person shall make application to Puget therefor, Puget shall have the right to serve any such applicant if and to the extent it may be required to furnish such service under the Public Service laws of the State of Washington . . . . If a party makes a bona fide offer to provide service under terms and conditions applicable generally to its other customer[s] of the same class and within the same area, it shall not be deemed to have failed, refused or been unable to provide service under this paragraph.

Ex. 2 at 3.

Puget argued vigorously before the trial court, as it does here, that Tanner's ability to provide adequate service to Nintendo was a factual issue that should have been decided by the jury. Both Puget and Nintendo discuss Nintendo's sophisticated power needs and Tanner's small-scale operations. They point to Tanner's four-member service crew, its single-source radial feed distribution system, Tanner's inadequate capacity and outdated equipment, its

lack of an adequate plan of service for the Nintendo facility, and Tanner's lack of experience with any large industrial customer.

The trial court found these issues irrelevant given the wording of the 1966 agreement concerning a bona fide offer:

> Whether Puget's service would be better than Tanner's, or would suit Nintendo's needs more adequately, would be factual issues. If material, they would prevent summary judgment in favor of Tanner on the issue of whether Puget breached the agreement.
>
> The parties, presumably recognizing the difficulty in resolving such issues, included the provision that if a party makes a bona fide offer to provide service under terms and conditions applicable generally to other customers of the same class within the same area, it shall not be deemed to have failed, refused, or been unable to serve. The application of this provision does not go beyond determining whether there was a [sic] offer of an adequate quantity of power at comparable terms.

Clerk's Papers at 594.

Puget contends, however, that the bona fide offer provision is inapplicable because Tanner has no customers similar to Nintendo. (It is undisputed that Tanner has no other large industrial customers. Its next-largest customer is a McDonald's restaurant. While Tanner does serve a mall with 38 stores and 5 other facilities, that service is provided via 43 separate meters rather than by one primary meter of the type required by Nintendo. Videotape Recorded Proceedings at 430.) Tanner maintains that the only purpose of this provision was to prevent discrimination between customers, but Puget maintains that another purpose was to create a test for determining whether Tanner has the ability to serve a particular customer. According to Puget, for the bona fide offer clause to apply, Tanner must already be providing power to customers of the same class, thereby demonstrating its ability to serve such customers. We again note Tanner's status as a rural

electric cooperative, and the fact that it gets a low-density discount from BPA because of its rural service. Videotape Recorded Proceedings at 667-68. It thus makes sense to assess Tanner's ability to serve a large industrial customer.

■■ We find it more than possible to read the "bona fide offer" provision of the contract as requiring a *genuine* offer of service to encompass terms and conditions offered to similar customers, and to render an offer made without such terms and conditions somewhat suspect. The dictionary defines "bona fide" as "truly; actually; without simulation or pretense." *Black's Law Dictionary* 177 (1980). Whether Tanner's offer of service to Nintendo, made without previous experience in serving such a large customer, was a true and actual offer is open to question. Given this uncertainty, the trial court erred in ruling that Tanner's ability to serve Nintendo was not a material factual issue that prevented it from granting Tanner's motion for summary judgment on its breach of contract claim.

We conclude that there is a factual question regarding whether the 1966 agreement allows consideration of the utilities' ability to serve similar customers when resolving a service dispute as well as whether the parties intended to incorporate a point of use test into the agreement. We therefore reverse the summary judgment order on Tanner's breach of contract claim.[7]

## II

The next issue is whether the jury properly found that Puget violated Washington's Consumer Protection Act, RCW 19.86 (hereafter referred to as the CPA). The purpose of the CPA is to complement the federal antitrust laws in order to protect the public and foster fair and honest competition. RCW 19.86.920; Martha V. Gross, Comment, *The*

---

[7]Since the jury was instructed that Puget breached the contract and that a breach of contract may satisfy the "improper means or purpose" element of tortious interference, the tortious interference verdict is also reversed.

*Scope of the Regulated Industries Exemption Under the Washington Consumer Protection Act,* 10 Gonz. L. Rev. 415 (1975). Following the congressional lead taken in the federal antitrust laws, the Washington Legislature has "shielded various activities from the rigors of competition" by exempting them from the provisions of the CPA. Gross, *supra* at 415. Areas which are exempt from both the federal and state antitrust laws are labor, agricultural and horticultural organizations and "regulated industries." Gross, *supra* at 415 (quoting RCW 19.86.170).

The first question to be resolved under this issue is whether Puget is a regulated industry exempt from the CPA. The trial court ruled that Puget's activities were not exempt in denying Puget's motion for a directed verdict and thus let the jury decide whether the CPA had been violated. RCW 19.86.170 contains the exemption language that is at issue here:

> Nothing in this chapter shall apply to actions or transactions otherwise permitted, prohibited or regulated under laws administered by the insurance commissioner of this state, the Washington utilities and transportation commission, the federal power commission or actions or transactions permitted by any other regulatory body or officer acting under statutory authority of this state or the United States. . . .

As explained earlier, service area agreements are both permitted and regulated under laws administered by the WUTC.

Tanner maintains, however, that while Puget's adherence to WUTC laws and regulations may be exempt from the CPA's reach, a violation of those regulations is not exempt. More specifically, Tanner declares that Puget's alleged breach of the 1966 service area agreement by serving Nintendo was not approved by the WUTC pursuant to RCW 54.48.030 and therefore does not render Puget exempt from CPA liability. Tanner's other allegations of CPA violations focus on Puget's refusal to increase the wheeling demand limit set forth by contract, Puget's failure to cooperate in a comprehensive plan of service for

the North Bend area, Puget's termination of the service area agreement and its refusal to negotiate in good faith for a new one. Tanner maintains that these activities are outside the scope of the WUTC's regulatory authority and thus outside the policies that would shield Puget from CPA liability under RCW 19.86.170.

 As we stated in Part I, we cannot conclude as a matter of law that Puget's service of Nintendo breached the 1966 agreement. Moreover, even if a jury determines that Puget has breached the 1966 agreement by serving Nintendo and has otherwise injured Tanner, such transgressions do not subject the utility to liability under the CPA. The exemption extends to actions that are *permitted, prohibited or regulated* by the WUTC, not just actions permitted by the WUTC. (As the Statement of Facts makes clear, the conduct complained of by Tanner is directly related to Puget's provision of electrical power.) Thus, Tanner's reasoning that the exemption does not extend to Puget's wrongdoing does not withstand analysis. Furthermore, Tanner's interpretation would reduce the statutory exemption to a nullity, since a plaintiff could always find a way to argue that his CPA claim did not challenge the regulated transaction itself, but only the harmful effects that flow from the regulated transaction. We can find neither case law nor commentary that applies consumer protection laws to public utilities on the basis of whether the activities engaged in are permissible or unlawful. An exemption from consumer protection legislation either applies or it does not. *See Southwestern Bell Tel. Co. v. Nash*, 586 S.W.2d 647 (Tex. Civ. App. 1979); *State ex rel. Guste v. Council of New Orleans*, 309 So. 2d 290 (La. 1975).

In explaining the scope of the CPA's exemption provision, one commentator states that the CPA uses the same basic provisions as the federal antitrust laws in adopting their objective of promoting competition in open markets. Gross, *supra* at 421-22. Congress has, however, decided that competition should not be entirely free in some industries and has substituted regulatory agencies to

administer the public interest. Gross, *supra* at 422; William L. McGovern, *Antitrust Exemptions for Regulated Industries*, 20 Fed. B. J. 10 (1960). By statutory authority, regulatory agencies may approve anticompetitive acts and practices which would, unless so immunized by agency action, violate the antitrust laws. Gross, *supra* at 422. Another authority explains the need for regulated monopoly in some industries:

> If competition is still an ultimate good in our economic system, it is not unqualifiedly so. Some areas of economic activity have long since been put under government monopoly. Many fall within the prohibitions of the antitrust laws. Where the number of enterprises that can exist efficiently in a field is severely limited, as with public utilities, government has had to furnish the necessary regulation which competition has been unable to provide.

George E. Turner, *Trends and Topics in Utility Regulation* 267 (1969); *see also* Charles F. Phillips, Jr., *The Regulation of Public Utilities* 5 (1984) ("[I]f economic power is not to be controlled by the market, it must be controlled by public authority, for a firm's contribution to the general welfare, rather than being the result of voluntary choice, must be compelled.") An exemption for public utilities pursuant to the express exemption accorded WUTC transactions makes sense given the need for regulated monopoly in the power industry.

As we stated earlier, the WUTC is charged with administering pervasive regulatory schemes that affect almost every phase of activity of the businesses under its authority. Gross, *supra* at 423. As part of this regulatory process, RCW 54.48.030 provides that the WUTC must approve all service area agreements entered into by public utilities and cooperatives. The impact of this regulation on the coverage of the CPA is described below:

> The public utilities industry is one where the legislature has decided that the public interest is best served by direct and uniform regulation of almost every phase of industry activity. Therefore, the public utility industry enjoys the

maximum exemption from the [CPA]. To not exempt the activities of the public utilities could interfere with the coordinated system of rules controlling the public utilities, expose the public utilities to possible double liability and create a risk of varying adjudications.

The statutory language is clear that, once a commission has acted on a matter over which it has authority, jurisdiction of the courts based on the Act is ousted. This exemption, which attaches even to actions prohibited by the regulatory agency, is broader than any exemption from federal antitrust laws granted by a federal agency.

Gross, *supra* at 424.

Tanner complains that it will be without a remedy for the wrongs it has suffered at the hands of Puget if the CPA exemption applies. Since the WUTC cannot grant monetary damages or issue an injunction, Tanner argues that its only antitrust remedy is in court. However, as one authority states, public service commissions do have regulatory power over service contracts:

Commissions frequently examine service contracts and exercise their regulatory functions with due consideration of contractual provisions. They cannot, however, compel a party to execute such a contract or modify it. This does not mean that they cannot require the performance of services in a different manner, or at different rates, than prescribed by contract. They do not change the contract but their orders may supersede contractual provisions.

Turner, *supra* at 252. The WUTC concedes that it can regulate the financial consequences of Puget's conduct, and that it can withdraw its approval of service area agreements on its own motion.

Moreover, should the commission rule that a practice of or service by a public utility is contrary to statutory policy there are stringent enforcement provisions in Title 80 RCW including private actions for damages. RCW 80.04.440 provides:

In case any public service company shall do, cause to be

done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or thing required to be done, either by any law of this state, by this title or by any order or rule of the commission, such public service company shall be liable to the persons or corporations affected thereby for all loss, damage or injury caused thereby or resulting therefrom, and in case of recovery if the court shall find that such act or omission was wilful, it may, in its discretion, fix a reasonable counsel or attorney's fee, which shall be taxed and collected as part of the costs in the case. An action to recover for such loss, damage or injury may be brought in any court of competent jurisdiction by any person or corporation.

Washington's Consumer Protection Act was enacted to promote free competition in the marketplace for the ultimate benefit of the consumer. *State v. Black*, 100 Wn.2d 793, 799, 676 P.2d 963 (1984); *Ballo v. James S. Black Co.*, 39 Wn. App. 21, 25, 692 P.2d 182 (1984). State law exempts public utilities from the sphere of free competition, and in fact discourages it. The regulation of public utilities by a state agency replaces competition and ensures that the public interest is protected. Given the language and purpose of the CPA, it makes sense to exempt Puget's activities from liability thereunder.

Any contention that this exemption lessens free and open competition in our economic system completely ignores the monopoly status of public utilities and their subsequent regulation by the WUTC. Moreover, the CPA exception for public utility actions does not mean that public utilities are allowed to run rampant. While their monopoly status necessarily means that economic competition is curtailed, remedies for egregious conduct on the part of public utilities remain, as our earlier reference to RCW 80.04.440 illustrates. This statute allows a private cause of action for anyone affected by a utility's violation of state law or commission order. If an aggrieved party turns to the WUTC, the commission may investigate complaints, award refunds to overcharged consumers and assess penalties against violators. Gross, *supra* at 424. We

find that given the WUTC's express statutory authority to regulate improper, unjust, and unreasonable practices of electrical companies, Washington law provides the degree of regulation necessary to exempt all of Puget's alleged misconduct from the CPA. *See generally* Title 80 RCW.

In light of our resolution of these issues, we need not address the remaining questions raised by the parties. We reverse the trial court's order of summary judgment and its decision regarding the CPA exemption and remand for further proceedings consistent with our decision.

DURHAM, C.J., and DOLLIVER, SMITH, GUY, and ALEXANDER, JJ., concur.

TALMADGE, J. (concurring) — I concur in the majority's determination to reverse the summary judgment and the judgment on the verdict of the jury, and to remand the case for further proceedings. However, in the process, the majority expands the regulated industries exception to the Consumer Protection Act (the Act), RCW 19.86.170, beyond recognition. The majority abandons the transactional approach to the regulated industries exception without addressing the plain statutory language and body of precedent underlying that approach. The result is to exempt from the protections of the Act even the most egregiously anticompetitive behavior solely because the party engaging in such behavior is theoretically subject to general regulation by an agency.

## A. Breach of Contract Claim

The majority correctly notes the Washington Utilities and Transportation Commission (WUTC) declined to consider a petition filed by Tanner Electric Cooperative (Tanner) in December 1990 seeking a ruling on whether Puget Sound Power & Light Company (Puget) had a statutory obligation to serve Nintendo of America, Inc. (Nintendo). Tanner also sought a ruling that Puget's service of Nintendo violated the 1966 service area agreement be-

tween Tanner and Puget, which had been approved by the WUTC pursuant to RCW 54.48. The WUTC declined to exercise jurisdiction to interpret or enforce the service area agreement or to determine the parties' rights thereunder. Neither party appealed the decision of the WUTC. Thus, the WUTC neither authorized, regulated nor prohibited the particular transactions and conduct of Puget that Tanner challenges in this litigation, although in the course of this lawsuit, the WUTC has attempted to intervene to argue the point of use test is the applicable law in Washington for this situation.

None of the parties has briefed nor argued the question of the scope of the authority of the WUTC. The majority spends a considerable portion of its opinion discussing the failure of the WUTC to act and WUTC's authority and responsibilities under its authorizing statute.[8] As none of the parties has addressed the issue, I do not believe we should render what amounts to an advisory opinion on the authority of the WUTC. *Walker v. Munro*, 124 Wn.2d 402, 414, 879 P.2d 920 (1994) (Washington courts do not render advisory opinions). That is an issue best left for another day.

The majority also determines the point of use test was not applicable as a matter of law. I am not convinced we need to deal with such an abstract issue. We are asked only to construe the terms of the service area agreement, which explicitly states: "Puget agrees that it shall not

---

[8]The majority states the WUTC has authority over cooperatives with respect to service area agreements. Majority op. at 666 n.2. However, RCW 54.48.030 states the WUTC must approve the public utility's participation in such an agreement, not the participation of the cooperative. Indeed, RCW 54.48.040 expressly states nothing in RCW Chapter 54.48 may be construed to classify a cooperative as a public utility "or to include cooperatives under the authority" of the WUTC.

Moreover, the majority asserts the exercise of WUTC regulatory authority ousts the jurisdiction of the courts. This is not necessarily so. RCW 80.04.440 provides a public service company that violates "any law of this state," Title 80, or "any order or rule of the commission," shall be liable for damages (and attorney fees in certain cases) in an action "brought in any court of competent jurisdiction." Nothing in the statute requires an administrative determination as a predicate to court jurisdiction.

directly or indirectly distribute, wheel, transfer or sell electric energy within the limits of Tanner's service areas." Ex. 2 at 2. This language is broad and makes clear Puget may not serve customers, directly or indirectly, within Tanner's service area. There is no question Nintendo, at least in substantial part, was located within the service area of Tanner. The contractual provision referenced above bars Puget from serving Nintendo, regardless of whether or not the point of use test would be implied in a service area agreement.

The trial court erred in granting summary judgment, however, because there is a fact question whether the parties themselves altered their obligations by their course of conduct. Here, as the majority recounts, there was evidence Tanner and Puget did not always observe the provisions of their own agreement barring direct or indirect service in the other's area. Summary judgment was inappropriate and Puget should be given the opportunity at trial to prove a course of conduct by the parties altered or obviated the contractual provisions.

Additionally, the 1966 agreement had specific wording which authorized Puget to serve a customer within Tanner's service area if Tanner failed, or was unable, to do so. Ex. 2 at 3. Plainly, there is a question of fact as to whether Tanner could reasonably serve a customer as large as Nintendo. Consequently, the majority is correct in reversing the summary judgment in favor of Tanner on its breach of contract claim.

### B. Consumer Protection Act Claim

I am more troubled by the majority's handling of the Consumer Protection Act claim. Because the claims for breach of contract and breach of the Consumer Protection Act are factually intertwined, I agree that the jury's general verdict with respect to the Consumer Protection Act also must be reversed. But the majority's analysis of RCW 19.86.170 is flawed, curtailing needed private enforcement of our State's antitrust laws.

The majority views the Act as "consumer protection legislation." Majority op. at 681. But the Act also provides a full range of remedies for situations where a business preys upon another. *See* RCW 19.86.020 (unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce), RCW 19.86.030 (restraints of trade), RCW 19.86.040 (monopolies), RCW 19.86.050 (tying arrangements), RCW 19.86.060 (corporate acquisitions that lessen competition). The Act guarantees open and free competition in our economic system.

The majority opinion gives a very broad reading to the regulated industry exemption to the Act. RCW 19.86.170 states:

> Nothing in this chapter shall apply to *actions or transactions otherwise permitted, prohibited or regulated* under laws administered by the insurance commissioner of this state, the Washington utilities and transportation commission, the federal power commission or actions or transactions permitted by any other regulatory body or officer acting under statutory authority of this state or the United States. . . .

(Emphasis supplied.) The majority suggests this exemption must be broadly construed, for, after all, "[a]n exemption from consumer protection legislation either applies or it does not." Majority op. at 681. I disagree. The statute plainly states the exemption applies to a particular action or transaction "otherwise permitted, prohibited, or regulated" by the WUTC. The exemption is not applicable simply because an entity is generally regulated. The statute mandates a transactional approach and does not confer an exemption on an industry simply because of its regulated status.

Previously, we have consistently held the Act does not exempt a regulated entity generally, but exempts only a particular action or transaction of such entity. *Dick v. Attorney General*, 83 Wn.2d 684, 688, 521 P.2d 702 (1974); Martha V. Gross, *The Scope of the Regulated Industries Exemption Under the Washington Consumer Protection Act*, 10 GONZ. L. REV. 415, 421 (1975). This transactional

analysis requires the court to identify the particular act or transaction allegedly violative of the competition laws, and then to specifically determine whether that act or transaction is exempt from such law because it was otherwise permitted, prohibited or regulated under the relevant state statute or federal law. "[W]e do not read the statute to exempt a transaction or action merely because the business or trade is regulated generally." *Dick*, 83 Wn.2d at 688.

In *In re Real Estate Brokerage Antitrust Litig.*, 95 Wn.2d 297, 622 P.2d 1185 (1980), we held certain transactions of real estate brokers were not exempt from the Act simply because brokers were generally regulated under RCW 18.85, and the relevant licensing agency had acquiesced in the brokers' conduct for 11 years. We noted "[m]ere non-action" by the agency would not suffice, and said the brokers had to prove the particular challenged activity was statutorily authorized and the relevant agency "took overt affirmative actions specifically to permit" it. *Real Estate Brokerage*, 95 Wn.2d at 301. We recently reaffirmed mere acquiescence by the relevant agency is not enough, and an overt affirmative act by the agency specifically allowing the challenged action is required for RCW 19.86.170 to apply. *Vogt v. Seattle-First Nat'l Bank*, 117 Wn.2d 541, 817 P.2d 1364 (1991). We have thus rejected the majority's approach to RCW 19.86.170 in *Dick*, *Real Estate Brokerage*, and *Vogt*.[9]

We are directed to liberally construe the remedial provisions of the Act, consistent with federal decisions interpreting the analogous limitations on federal laws

---

[9]Presumably, if the majority is correct in its interpretation of RCW 19.86.170, our interpretation of RCW 19.86 in other cases is affected as well. For example, this Court and the Washington State Bar Association regulate attorneys. *Short v. Demopolis*, 103 Wn.2d 52, 62, 691 P.2d 163 (1984); RCW 2.48.060, .220, .230. Our application of RCW 19.86 to the entrepreneurial aspects of the practice of law in *Short*, 106 Wn.2d at 60, is inconsistent with the majority's analysis.

ensuring fair competition.[10] The relevant federal cases repeatedly state mere pervasive regulation or a potential for conflict between the commands of the regulatory agency and the requirements of antitrust law is insufficient to shelter a regulated entity from antitrust liability, and, at a minimum, specific agency action approving the challenged conduct is required. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S. Ct. 1022, 35 L. Ed. 2d 359 (1973). There, the United States Supreme Court held that "[a]ctivities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws." *Otter Tail*, 410 U.S. at 372. The Court held even though the Federal Power Commission was authorized to compel involuntary interconnections of power, an electrical utility that refused to wheel electricity was not exempt from federal antitrust laws. *Id.* at 374-75. The Court stated antitrust immunity by implication from a regulatory statute is strongly disfavored and only may be found where there is a "plain repugnancy between the antitrust and regulatory provisions." *Id.* at 372.[11]

An analogous analysis is found in the federal courts' state action exemption to federal antitrust law, which

[10]RCW 19.86.920 states:

The legislature hereby declares that the purpose of this act is to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition. It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters. . . . To this end this act shall be liberally construed that its beneficial purposes may be served.

[11]Even active agency approval of some part of the challenged conduct may not suffice. In *City of Mishawaka, Ind. v. Indiana & Mich. Elec. Co.*, 560 F.2d 1314 (7th Cir. 1977), *cert. denied*, 436 U.S. 922 (1978), the court held that despite the Federal Power Commission's concurrent exercise of jurisdiction to approve the utility's retail rates, there was no exemption sheltering its dual rate structure (charging higher rates to wholesale customers) from scrutiny in court. The court also noted that an antitrust action in court would provide compensatory and injunctive relief that was not available in agency proceedings concerned with approval of retail rates. *Id.* at 1321. In *Frontier Enters., Inc. v. Amador Stage Lines, Inc.*, 624 F. Supp. 137, 143 (E.D. Cal. 1985), the court found the agency's approval of a tariff provided no exemption where the agency did not consider the alleged overall conspiracy and price squeeze involving the tariff rates.

provides an exemption from federal antitrust laws for anti-competitive conduct that is regulated by the state or its subdivisions. *Parker v. Brown*, 317 U.S. 341, 63 S. Ct. 307, 87 L. Ed. 315 (1943). The United States Supreme Court has held the "mere possibility of conflict" between state regulatory policy and federal antitrust policy is not enough to invoke the state action exemption. *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 596, 96 S. Ct. 3110, 49 L. Ed. 2d 1141 (1976). For the state action antitrust exemption to be implied, it must be necessary to make the regulatory scheme work. *Cantor*, 428 U.S. at 597. An implied exemption will be found only if the regulated entity shows there is a clear and affirmative state policy to allow the anticompetitive conduct, and the relevant state agency actively supervises the challenged conduct. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S. Ct. 937, 63 L. Ed. 2d 233 (1980); *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 112 S. Ct. 2169, 119 L. Ed. 2d 410 (1992).

Active supervision under the *Midcal* test requires the state agency have *and* utilize authority to approve or disapprove of the particular conduct. Without this degree of active supervision, there is no assurance the conduct promotes the state regulatory policy at all, rather than the regulated entity's individual interest. *Ticor*, 504 U.S. at 634; *Patrick v. Burget*, 486 U.S. 94, 101, 108 S. Ct. 1658, 100 L. Ed. 2d 83 (1988). Pervasive regulation does not protect an industry from antitrust liability for conduct that is voluntarily initiated. *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1103 (7th Cir. 1983), *cert. denied*, 464 U.S. 891 (1983).

In *Ticor*, the Third Circuit Court of Appeals found the state supervision requirement of *Midcal* was satisfied where there was a state regulatory program in place under which the agencies theoretically could reject the rates filed by title insurers. *Ticor*, 504 U.S. at 631-32, 637. The United States Supreme Court rejected this approach, holding that "[t]he mere potential for state supervision is not an adequate substitute for a decision by the State" actu-

ally reviewing the challenged conduct. *Id.* at 638. The Court found the state supervision requirement contemplated actual state involvement or participation in the challenged conduct, *id.* at 633, such that it may be said the anticompetitive scheme is the "State's own." *Id.* at 635. "[W]hile a State may not confer antitrust immunity on private persons by fiat, it may displace competition with active state supervision if the displacement is both intended by the State and implemented in its specific details." *Id.* at 633.

The majority does not undertake a transactional analysis or show why sheltering Puget from liability under the Act is necessary to avoid duplication of electric lines and service. RCW 54.48.020. Nor does the majority address how the WUTC's deliberate decision to refrain from reviewing the challenged conduct here can constitute WUTC involvement making Puget's behavior the State's own. Instead, ignoring the relevant state and federal cases, the majority observes WUTC theoretically could regulate some aspects of Puget's conduct and years ago did approve the 1966 service area agreement (under RCW 54.48), and concludes that is enough to establish an exemption under RCW 19.86.170. Majority op. at 682-83.

The key flaw in the majority's analysis, however, is its failure to consider whether the WUTC actively and specifically approved the actions of Puget in 1989-90 that Tanner challenges—Puget's servicing of Nintendo in Tanner's area, in violation of the agreement; Puget's refusal to wheel electricity or cooperate in a service plan for the North Bend area; Puget's termination of the agreement and refusal to properly negotiate a new one; and Puget's alleged attempt to consolidate monopoly power by buying Tanner. Clearly, the WUTC's approval in 1974 of the 1966 agreement did not constitute approval of these actions and is far from sufficient to shelter Puget from the obligations and liability imposed under the Act. Gross, *supra,* at 430-31; *Vogt,* 117 Wn.2d at 552; *Real Estate Brokerage,* 95 Wn.2d at 301. The WUTC's decision that it had no juris-

diction over the dispute precludes a finding it affirmatively approved or actively supervised the acts at issue.

The very broad reading given to RCW 19.86.170 by the majority wraps any regulated industry with a cloak of immunity, allowing it to engage in any anticompetitive behavior, no matter how predatory, just because *theoretically* the relevant agency could regulate the conduct. The majority's approach undercuts more than 20 years of Washington precedent in applying RCW 19.86.170 on a transactional basis. It violates the plain language of RCW 19.86.170, and the directive to construe the Act in accordance with federal decisions. The majority effectively allows a blanket immunity from private enforcement of our State antitrust laws for the regulated trades, professions and industries. The ultimate effect of this decision is to diminish private antitrust enforcement and to lessen competition in our economic system.

JOHNSON, J., and UTTER, J. Pro Tem., concur with TALMADGE, J.

After modification, further reconsideration denied July 23, 1996.